THE HON. WILLIAM L. HOLLOWAY,
THE HON. JOHN HURLY,
THE HON. JOHN A. MATTHEWS,
THE HON. CHARLES H. COOPER,
} Associate Justices.

---

EMERSON-BRANTINGHAM IMPLEMENT CO., APPEL-
LANT, *v.* ANDERSON, RESPONDENT.

(No. 4,210.)

(Submitted September 24, 1920. Decided December 13, 1920.)

[194 Pac. 160.]

*Mortgages — Foreclosure — Cancellation of Instruments —
Fraud—Undue Influence—Burden of Proof—Consideration.*

Fraud—Essentials.
    1. To make out a case for relief on the ground of fraud, it must appear that the party against whom the fraud is alleged made a misrepresentation of a material fact, with intent to induce the other party to act upon it, and that the latter believed, and relied and acted upon it to his damage.

Same—What Does not Constitute.
    2. A misrepresentation or opinion expressed by one to another as to the law relative to their respective rights in the matter which is the subject of negotiations is not a fraudulent misrepresentation.

---

Right to have money obligation canceled in action for damages for fraud in inducing contract, see note in 3 **A. L. R.** 74.

Opinion on question of law by party to contract for sale of land as sufficient basis to support charge of fraud, see note in **Ann. Cas.** 1913B, 1143.

Undue influence as related to fraud, see note in 18 **Ann. Cas.** 412.

(617)

Same—Misrepresentation as to Law—When Fraud.

3. If a relation of trust and confidence exists between parties, a misrepresentation or opinion by the party in whom the trust and confidence is reposed as to what the law is, if made for the purpose of deceiving the other or gaining an unconscionable. advantage over him, constitutes a ground for relief.

Same.

4. If one who knows the law deceives another by misrepresenting it to him and, knowing him to be ignorant of it, takes advantage of him by reason of his ignorance, an action for fraud lies.

Same—Expression of Opinion.

5. A statement merely as to what the party making it intends to do is not a misrepresentation, since it is not an affirmation of a fact but only an assertion of a present mental condition or opinion existing in him.

Same—What not Fraudulent Representation.

6. A representation by the agent (an attorney) of plaintiff implement company, chattel mortgagee, to the mortgagor's widow and executrix that if she refused to give additional security the mortgage would be foreclosed and certain of her own property taken to satisfy it, was merely the statement of an intention and not the affirmation of a fact, did not amount to a fraudulent representation, though the maker of it must have known that the latter part thereof could not be carried out, a fiduciary relation not existing between him and her, and was insufficient to invalidate a mortgage thereafter given by her on the ground of fraud.

Same.

7. The statement by plaintiff's agent in endeavoring to persuade defendant to furnish additional security for a chattel mortgage theretofore executed by her deceased husband, that he could not see why she, apparently capable of taking care of her own business, needed anybody's advice, was a mere expression of his opinion as to her business capacity, and not one upon which to base a charge of fraud.

Same.

8. Where a testator's will provided that his widow, and executrix, should have full power to sell and dispose of his property for any purpose without order of court, a representation by plaintiff's agent (an attorney) that she had such power, being true, could not be characterized as fraudulent.

Contracts—Undue Influence— Cancellation—Essentials.

9. Under section 4981, Revised Codes, to make the defense of undue influence available, the party alleged to have exercised such influence over another in the execution of a contract must have occupied a superior position with reference to the other by reason of a real or apparent authority over him arising out of pre-existing relations, or assumed at the time because of the weakness of mind, distress or necessities of the other, by reason of which he knowingly gained an unconscionable advantage.

Same—Undue Influence—Burden of Proof—Contracts—Validity—Presumptions.

10. Since the law presumes that a contract fair on its face was the result of the voluntary act of the parties to it, the burden is on him who seeks release from an obligation, apparently voluntarily assumed, on the ground of undue influence, to show by a preponderance of the evidence that it was induced by such predominating influence exerted over him as to preclude the presumption that he acted from free choice.

Same—Undue Influence—Burden of Proof Shifts, When.

    11.  Where antecedent confidential relations are shown so as to create a presumption of undue influence, the burden shifts to the adverse party to show that the negotiations resulting in the contract were conducted at arm's-length, uninfluenced by the superior position held by him.

Same—Undue Influence—What Does and What Does not Constitute.

    12.  Solicitation, importunity, argument and persuasion are not undue influence, and a contract may not be set aside merely because one party used such means to obtain the consent of the other; influence becoming undue only when the means employed work a dominion over the will of another to such an extent as to destroy free agency or to constrain him to do against his will what he is unable to refuse.

Same—Cancellation of Instruments—Undue Influence—Evidence—Insufficiency.

    13.  Where a chattel mortgagee's representative and the mortgagor's executrix were strangers, and no fiduciary relationship existed between them, and the executrix was not affected by any weakness of mind or laboring under any pressing necessity, a mortgage, executed by her on her own property on his solicitation, upon apparently due consideration, was not invalid for undue influence merely because it was given about two months after the death of her husband, when her grief had perhaps not entirely subsided.

Mortgages—Forbearance to Foreclose—Consideration.

    14.  Forbearance from foreclosing a mortgage executed by defendant's husband in his lifetime, *held* to have been a sufficient consideration for the execution of an additional one on property owned by her.

*Appeal from District Court, Cascade County; J. B. Leslie, Judge.*

ACTION by the Emerson-Brantingham Implement Company against Nellie Anderson. Judgment for defendant and plaintiff appeals. Remanded with directions.

*Messrs. McKenzie & McKenzie,* for Appellant, submitted a brief; *Mr. John McKenzie* argued the cause orally.

The court erred in finding that defendant received no consideration for the notes and mortgage. "A valuable consideration in the sense of the law may consist either in some right, interest, profit or benefit accruing to the one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by another." (Norton on Bills and Notes, p. 256.) Thus we find the courts have held a sufficient consideration to be the forbearance of the debt of another, a promise to give up a bill thought to be invalid, or a debt,

barred by the statute of limitations, or debt discharged in bankruptcy. (*Id.*, p. 258; *Meltzer* v. *Doll*, 91 N. Y. 365.)

"An agreement to extend the time of payment of a debt is sufficient consideration for the execution by a third party of his note to the creditor, as collateral security for the payment of said debt." (*Nichols & Shepard Co.* v. *Dedrick*, 61 Minn. 513, 63 N. W. 1110; *Peterson* v. *Russell*, 62 Minn. 220, 54 Am. St. Rep. 634, 29 L. R. A. 612, 64 N. W. 555.) "A promise of forbearance to sue a third person for a certain time is a consideration sufficient to support a note." (3 R. C. L., sec. 136.) Defendant was the owner of the machinery on which deceased had given a mortgage, and she did not want it foreclosed. We therefore submit that the consideration for the notes and mortgage was the forbearance of plaintiff from foreclosing the mortgage given by Anderson. By giving the notes and mortgage sued on in this case, she secured further time for the payment of her husband's debt to plaintiff and relieved her property—the engine—from the possibility of foreclosure. Plaintiff surrendered the right and advantage to foreclose, and the defendant saved her property—the engine—from foreclosure; she gained further time, which was a sufficient consideration for the notes and mortgage under consideration. (*Ford* v. *Drake*, 46 Mont. 314, 127 Pac. 1019.) Under the decisions this was a sufficient consideration.

*Mr. E. K. Cheadle* and *Mr. Burton R. Cole*, for Respondent, submitted a brief; *Mr. Cole* argued the cause orally.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This action was brought on July 21, 1916, to foreclose a mortgage upon a lot situate in Great Falls, Cascade county, belonging to the defendant. The mortgage was given to secure the payment of two promissory notes executed by defendant to plaintiff on October 31, 1913, due and payable, respectively, on December 1, 1913, and November 1, 1914, with interest at eight per cent per annum, together with attorney's fees in case it should become necessary to bring action of

foreclosure. Recovery is also sought for the sum of $15 expended by plaintiff for an abstract of title of the mortgaged property, which it is alleged is also secured by the mortgage.

In her answer defendant seeks affirmative relief by way of counterclaim, demanding cancellation of the notes and mortgage on the ground that they were obtained by fraud, undue influence and without consideration. The allegations of the answer, in so far as they are material, are substantially the following: That defendant is the widow of Stephen A. Douglas Anderson, deceased, who in his lifetime was indebted to plaintiff; that she is the executrix of his will; that the estate is insolvent; that one Weston Houghton and one G. A. McFarlane, plaintiff's authorized agents and representatives, on or about October 31, 1913, demanded of defendant that she execute to plaintiff the notes described in the complaint and the mortgage to secure them, in settlement of the indebtedness of the deceased; that she was not personally liable for any of the debts of the deceased; that to induce her to execute the notes and mortgage, plaintiff's said agents falsely and fraudulently represented to her that she was personally liable for the indebtedness due from the deceased to the plaintiff; that unless she should execute and deliver the notes and mortgage the plaintiff would enforce the payment of the indebtedness against her, and would seize and sell her separate property to satisfy it; that these representations were each and all of them false and fraudulent, as plaintiff's agents well knew, and that they were made for the purpose of defrauding defendant; that she endeavored to consult her attorney and ascertain whether the representations were true; that on said day her attorney was absent from his office in Lewistown, Fergus county, Montana, where she resides, and that she was not able to consult him; that the said agents did then and there represent to her that it was not necessary for her to consult an attorney; that they were men of large business affairs; that defendant was wholly unused to transacting business; that at that time she had been recently bereaved by the death of her husband; that she was in an overwrought, abnormal and depressed condition of mind because of the death of her husband,

and was unable to withstand the arguments and representations of the plaintiff's agents; that relying upon their false and fraudulent representations, and believing the same to be true, she yielded to their demands, and by reason of them made, executed and delivered to the plaintiff the notes and mortgage; that defendant discovered the falsity of the representations so made to her, on or about December 27, 1913; that she thereupon, through her attorney, made demand upon the plaintiff for the return to her of the promissory notes and for the satisfaction of the mortgage; that the plaintiff wholly failed and refused to comply with her request; and that the defendant received no consideration or thing of value of any kind, nature or character for the execution and delivery by her to the plaintiff of the notes and mortgage. The reply put in issue these allegations.

The court found the facts to be as alleged in the counterclaim, and concluded that the notes and mortgage were void for the reasons: (1) That the defendant was induced to execute them by reason of the false and fraudulent representations of plaintiff's agents; (2) that the plaintiff's agents secured the execution of them by means of undue influence exerted over the defendant; and (3) that she, not theretofore being indebted to the plaintiff, received no consideration for them whatever. Accordingly it rendered judgment, directing the plaintiff to cancel the notes and to satisfy the mortgage of record. Plaintiff has appealed from the judgment, and presents the question whether the findings and decision are justified by the evidence.

At the time of his death, on September 4, 1917, Anderson was indebted to the plaintiff, evidenced by promissory notes, for the purchase price of a traction engine, to secure which he had executed upon it to plaintiff a chattel mortgage. This had been renewed from time to time up to July 1, 1913. It had been overdue since that time. By his will, Anderson bequeathed to defendant the residue of his estate after the debts had been paid, and conferred upon her "full and unlimited power to sell, convey, transfer and dispose of any or all of the property * * * for the purpose of paying my debts

or for any other purpose at any time after my death without obtaining an order of any court and without the intervention of any court whatever.'' On October 31, 1913, Houghton and McFarlane, agents of plaintiff, visited the defendant to obtain from her a settlement of the notes. They demanded payment of them. Defendant insisted that they take the engine in satisfaction of them, but they refused to do so, demanding that she should either pay them or furnish security. The following excerpts from her testimony disclose all the negotiations which then took place:

"They came in and said they came to get some settlement for this engine. * * * I told them I had nothing to pay them, and they could make some arrangement to take the engine back for what there was against it. He [McFarlane] said no, they wouldn't do that, they wanted some kind of security, but they didn't want no engine back. They wasn't in that line of business—they had engines to sell. They kept talking for quite a while. They said they would take security on a piece of land that I had. I told them that it was mortgaged before. They said they would be willing to take a second mortgage on that; and I told them I didn't want no more mortgages on it, and I would rather they would make arrangements, and I thought I could get permission from the court to turn the engine back to them for the amount that was due. I told them I didn't like to mortgage anything that I thought was my own property, and they said if I didn't give them some kind of security, they would foreclose on the mortgage and take enough other property to cover the expenses and everything concerning it. They mentioned my husband's homestead and desert. Q. You say they said if you did not give them a mortgage on something that they would foreclose on the engine? A. Yes, sir. Q. And then take enough other property to pay the balance? A. Yes. Q. Mentioning especially the homestead? A. Yes. The homestead and the desert—and other property to cover the amount there was to pay what was against the engine. They sat there an hour and a half, or something like that. I don't remember exactly. He [McFarlane] said he was in a hurry to get back, he wanted a set-

tlement and wanted to go back to Billings that afternoon, and he wanted to know what I was going to do. He said, 'You can study about it,' and he went downtown and they called me up in the afternoon and wanted to know what I was going to do. In the meantime, before he left, I said I wouldn't give him the mortgage on the land, but I had a lot in Great Falls, and if I had to give a mortgage on anything, I would rather give them security on that. He didn't like to take that because he said it wasn't worth very much, it wasn't big enough security. Then they called me up later in the afternoon and wanted to know what I was going to do, and I said, 'If I have got to, I suppose I have to rather than to have any trouble in foreclosing.' He came back, and had the mortgages all made out, and the notes, and I signed them. That was in the afternoon of the same day. I don't remember the exact hour. Q. Did you believe at the time that you signed this mortgage and these notes that if you did not sign them the Emerson-Brantingham Implement Company would foreclose that old mortgage on the engine? A. I surely did, or I would not have signed it. Q. Did you believe if you didn't sign this mortgage and these notes that the plaintiff corporation would have taken your husband's homestead away from him [you]? A. I believe it might be they could. I didn't know the law, and he said the way my husband made his will he gave me the right to pay up the debts without any permission of the court or advice of any attorney. Said he didn't see why I needed the advice of anybody to look after the business myself. He said, 'I am an attorney myself, and I can't see why you need the advice of anybody; you look to me like a woman who is capable of taking care of your own business,' and when he said he was an attorney and seemed like—I thought he wouldn't be wanting to take everything away from a woman and a child. * * * Q. Had you, in the meantime between the first and second visits, had you attempted to get any advice in the matter as to whether you would sign the mortgage? A. Yes, I called you [one of her counsel] up, and you wasn't at home or in your office. Q. So you actually signed these papers without any advice from anybody except Mr. McFarlane? A.

Yes, sir.   *   *   *   Q. What was the condition of your mind at that time? A. Well, its pretty hard to explain with words. I was very worked up, upset about his death; I had so much trouble. Q. Had you ever attended to the business affairs of the family during your husband's lifetime? A. No, sir; not of that kind. Q. Who attended to them? A. Mr. Anderson attended to the business. Q. How much experience had you had in business matters at that time? A. None at all at that time. Q. What, if anything, did Mr. McFarlane say as to your right to dispose of your husband's property, or exercise dominion over it? A. Well, he seemed to think that I could dispose of it as I pleased, with his property—after he gave his will in that way—I could pay up the bills, and the balance would be for myself.   *   *   *   Q. You stated a while ago that Mr. McFarlane stated that he was a lawyer? A. Yes, he said, 'I am an attorney myself, but I can't see why you need any permission or advice from any court, and you can go ahead and attend to his business without it.' That he thought—he threw the bouquet at me—that he thought I was a woman capable of looking after my own business, but he says, 'You can ask your attorney if you want to.' " In another part of her testimony she stated that she had found the indebtedness of the estate greater than she had anticipated, and that she did not think there was sufficient property to pay it.

The result of the negotiations was that the defendant renewed the chattel mortgage upon the engine, and in addition executed the mortgage and notes in controversy. McFarlane was dead at the time of the trial. Houghton was called as a witness, and testified in relation to the transaction, but his account did not differ materially from that of defendant, except that he testified that McFarlane told her that if she did not furnish the desired security the plaintiff would foreclose the old mortgage on the engine and take judgment for any deficiency which might remain unsatisfied.

The mortgage obligated the defendant, among other things, to pay all taxes assessed, or to be assessed, against the prop-

erty, and to keep any buildings thereon insured for the benefit of the plaintiff. It provided that in case the defendant defaulted "in any of the terms of said notes or of this mortgage," *etc.*, or in the payment of any prior lien or encumbrance upon the property or taxes, *etc.*, the plaintiff might pay such prior liens, taxes, *etc.*, and that all sums so paid should bear interest at twelve per cent per annum from the date of their payments, and should become a part of the debt secured by the mortgage; "and that said sum or sums of money so paid and the notes and money hereby accrued [secured?] shall, at the option of said party of the second part, its successors or assigns, thereupon and without notice to said party of the first part or any other party, become immediately due and payable, anything herein or in said notes contained to the contrary notwithstanding, and the payment thereof may be enforced by foreclosure of this mortgage, by action, or advertisement or in any other manner; and said notes and sum or sums of money [to be?] paid as aforesaid shall draw twelve per cent per annum thereafter."

Upon an analysis of the account of the transaction as given by the defendant herself, without regard to the testimony of Houghton, we are of the opinion that under the rules of law applicable it furnishes no substantial basis for any of the conclusions reached by the trial court.

As to the alleged fraudulent representations: To make a case [1] for relief on the ground of fraud, it must appear with reasonable certainty that the party against whom the fraud is alleged made a misrepresentation of a material fact; that he made it with the intent to induce the other party to act upon it; that the latter believed and relied upon it; and that he acted upon it to his damage. (Rev. Codes, sec. 4978; *Buhler* v. *Loftus*, 53 Mont. 546, 165 Pac. 601, and cases cited.) A misrepresentation or opinion expressed by one of the parties [2] to the other as to what the law is relative to their respective rights in the matter, which is the subject of negotiations, is not a fraudulent misrepresentation within this rule. Everyone is presumed to know the law, and is bound to take notice of it. Hence neither party has a right to rely on such a rep-

resentation or opinion, and will not be permitted to say he was misled by it. (12 R. C. L., p. 295; 14 Am. & Eng. Ency. of Law, 2d ed., p. 54; Pomeroy's Equity Jurisprudence, sec. 877.) [3] If, however, a relation of trust and confidence exists between the parties, a misrepresentation or opinion by the party in whom the trust and confidence is reposed as to what the law is, if made for the purpose of deceiving the other or of gaining an unconscionable advantage over him, forms an exception to the foregoing rule, and constitutes a ground for [4] relief. (12 R. C. L., p. 296.) So, also, if one who knows the law deceives another by misrepresenting it to him, and, knowing him to be ignorant of it, takes advantage of him by reason of his ignorance, this is a misrepresentation within the exception. Still another exception, recognized by some courts, is when the person to whom the representation is made relies upon the superior knowledge and experience of the other party, and upon a statement by him that it is not necessary for him to consult counsel. (12 R. C. L., p. 296; *Olston* v. *Oregon Water Power & R. Co.,* 52 Or. 343, 20 L. R. A. (n. s.) 915, 96 Pac. 1095, 97 Pac. 538.) A statement merely as to what the party [5] making it intends to do is not a misrepresentation, since it is not an affirmation of the fact, but is only an assertion that a present mental condition or opinion exists in him. (Pomeroy's Equity Jurisprudence, sec. 877.)

It is apparent from the testimony of the defendant that McFarlane acted as exclusive spokesman for the plaintiff. The representations made by him may be epitomized in brief as follows: (1) That if defendant did not give the plaintiff some [6-8] kind of security, it would foreclose the mortgage on the engine and take enough other property—mentioning the homestead and desert land—to pay any balance then left due; (2) that he was an attorney, and that he could not see why she, a woman who appeared to be capable of taking care of her own business, needed the advice of anybody; and (3) that under the terms of the will she could dispose of the property belonging to her husband's estate as she pleased, without the intervention of any court.

It will be observed that the defendant nowhere testified that she accepted these statements as true, and relied upon them, but merely stated that she would not have signed the notes and mortgage if she had not believed that, unless she should do so, the plaintiff would foreclose the mortgage. As to the possibility of plaintiff's seizing upon the homestead or desert land, she merely said, when questioned by her counsel: "I believe it might be they could. I didn't know the law, and he said the way my husband made his will, he gave me the right to pay the debts, without any permission of the court or advice of any attorney."

Whatever opinion one would be justified in entertaining as to the method pursued by McFarlane from an ethical point of view, the representations made by him, taken together with all the attendant circumstances, do not warrant the conclusion that he defrauded defendant. The first representation was merely the statement of an intention, and not the affirmation of a fact. Though the term covered by the mortgage had expired at the time the new mortgage and notes were executed, and, had Anderson been living, it would have been open to assault by any one of his creditors, yet, as between him and the plaintiff, the latter would have had the right to foreclose it in the absence of a statutory provision 'to the contrary. There is no such provision in this state, and therefore the life of the lien created by it continued until the debt secured by it became barred by the statute of limitations. (Jones on Mortgages, 5th ed., sec. 771.) The accident of Anderson's death did not destroy the lien. The defendant, by becoming executrix of his estate, was merely substituted in his place as his representative. Under other provisions of the Code applicable, the plaintiff had the option either to proceed to foreclose after presenting his claim (the notes) to defendant for allowance (Rev. Codes, sec. 7525), or, if it did not desire to do this, it could have proceeded to foreclose, without the right, however, of presenting a claim against the estate for any balance remaining due after foreclosure. (Rev. Codes, sec. 7532.) Though McFarlane must have known that it could not carry out in its entirety the intention so expressed by him, this,

under the rule stated on the subject *supra*, did not amount to a fraudulent representation. If the statement be considered as an expression of his opinion as to the extent of plaintiff's legal rights, it does not come within the exception to the rule *supra*, denouncing such statements as fraudulent, for no fiduciary relation existed between him and the defendant. Nor does it come within any of the other exceptions to the general rule. It does not appear that he took advantage of her ignorance of the law. After the first interview, when this opinion was expressed and she had refused to give the security, he went away, avowedly to give her an opportunity to consider his proposition and to consult her attorney, if she chose to do so, which he, in fact, suggested she should do. The second representation was a mere expression of his opinion as to defendant's business capacity. The third was literally true, for under the terms of the will she had full authority to sell and dispose of the property as she pleased, and she must have known that this was a fact. It may be observed, too, that the result of the negotiations was, not that she did what he insisted she should do, *viz.*, give a second mortgage on land belonging to the estate, but that she gave a mortgage on the Great Falls lot, as she first proposed to do, and this, too, so far as he knew, after fully considering the situation and consulting her attorney. He, therefore, did not knowingly take advantage of her ignorance.

As to undue influence: Under the statute, undue influence [9] consists: "1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him. 2. In taking an unfair advantage of another's weakness of mind; or, 3. In taking a grossly oppressive and an unfair advantage of another's necessities or distress." (Rev. Codes, sec. 4981.) To meet the requirements of this definition, the one party to the negotiations must occupy a superior position with reference to the other by reason of a real or apparent authority he holds over him, arising out of pre-existing relations, or assumes at the time because of the weakness of mind or distress or necessities

of the other, by reason of which he knowingly gains an advantage, which in contemplation of law is unconscionable. Whether a court of equity will use its power to release the complaining party from an obligation apparently assumed by him depends upon the facts of the particular case. In either case, the court starts out with the presumption that a contract, [10] fair on its face, is valid, and is the result of the voluntary act of both parties. The law recognizes the right of every person, when not hindered by personal incapacity or some provision of law, to act according to his own free choice. It therefore casts the burden upon him who seeks release from an obligation apparently voluntarily assumed by him, to show by a preponderance of the evidence that its assumption was not his voluntary act; in other words, that it was induced by such predominating influence exerted over him by the other party as to preclude the presumption that he acted from free choice. "Where an antecedent fiduciary relation exists, a [11] court of equity will presume confidence placed and influence exerted; where there is no such fiduciary relation, the confidence and influence must be proved by satisfactory extrinsic evidence; the rules of equity and the remedies which it bestows are exactly the same in each of these two cases." (2 Pomeroy's Equity Jurisprudence, 951.)

The presumption referred to by Mr. Pomeroy arises only when it is shown that antecedent relations between the parties in fact existed. When the presumption does arise, the burden shifts to the adverse party to repel it by showing that the negotiations resulting in the contract were conducted at arm's-length, uninfluenced by the superior position held by him. The [12] law recognizes a distinction between what may be deemed "due influence," which is entirely legitimate, and what the statute denounces as "undue influence." On this subject, Mr. Lawson, in his article on Contracts found in 9 Cyc. 455, states the distinction thus: "Solicitation, importunity, argument and persuasion are not undue influence, and a contract is not to be set aside merely because the one party has used these means to obtain the consent of the other. Influence obtained by persuasion and argument, or by appeals to the

affections is not prohibited either in law or morals and is not obnoxious even in courts of equity, and may be termed 'due influence.' Nor is the case changed because the parties stand in confidential relations to each other. The line between due and undue influence, when drawn, must be with full recognition of the liberty due every true owner to obey the voice of justice, the dictates of friendship, of gratitude, and of benevolence, as well as the claims of kindred, and, when not hindered by personal incapacity or particular regulations, to dispose of his own property according to his own free choice. But, on the other hand, influence attained by flattery, importunity, superiority of will, mind, or character, which gives dominion over the will of another to such an extent as to destroy free agency or to constrain him to do against his will what he is unable to refuse, is such influence as equity condemns as undue."

Bearing in mind these general principles, let us examine the [13] facts as testified to by the defendant. McFarlane and the defendant were strangers. Therefore no antecedent fiduciary relation existed between them, nor did McFarlane hold any real or apparent authority over her. The defendant was not affected by any weakness of mind. Her testimony evinces the contrary. Neither was she laboring under any pressing necessity. There is nothing in her testimony to indicate this. Evidently the court reached the conclusion it did upon the theory that McFarlane took advantage of her distress of mind due to the death of her husband, and thus induced her to enter into what it regarded as a grossly unfair bargain. The only fact stated by her in this connection was her statement, by way of conclusion: "I was very worked up, upset about his [her husband's] death; I had so much trouble." Let it be conceded that after the lapse of some two months from the death of her husband, her grief had not entirely subsided: Does it follow, as a matter of law, and for this reason alone, that her contract, fair on its face, entered into while she was in this condition, should be declared unconscionable? As we have said, the evidence does not convict McFarlane of fraud. Under the rule laid down by Mr. Lawson, *supra*, we do not think

he transcended the line of distinction between due and undue influence. On the contrary, it appears that the negotiations were conducted at arm's-length. She did not act upon a momentary impulse, but upon apparently due consideration, after a flat refusal in the first place to act at all. The consideration that impelled her evidently was that, if she could obtain delay, she might prevent foreclosure proceedings, and in the meantime put herself in position to pay the debt, and thus save the engine.

As to the consideration: Consideration is "any benefit conferred or agreed to be conferred upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor * * * ." (Rev. Codes, sec. 5001.)

It is not necessary to cite any authority to support the conclusion that the forbearance accorded to the defendant under the [14] terms of the contract was sufficient to sustain it. All the authorities, though expressing the rule in varying terms, agree in substance with the statements contained in the section of the statute *supra*. To be sure, the result may be considered a hard bargain, in that the defendant assumed liability for a debt for which she was not liable in the first place, but it is not the office of courts to make bargains for parties, but to enforce them in all cases; their only legitimate inquiry being whether such bargain has in fact been made.

The cause is remanded to the district court, with direction to set aside the findings and judgment in favor of defendant, and to make findings in favor of plaintiff and render judgment accordingly.

*Remanded with directions.*

ASSOCIATE JUSTICES HOLLOWAY, HURLY, MATTHEWS and COOPER concur.