Isabella McKee, Appellant, v. James W. McKee et al.,
Appellees.

**DEEDS:** Fraud—Undue Influence—Mental Incompetency.  Evidence
1  reviewed in detail, and held wholly insufficient to justify the set-
ting aside of deeds from a mother to her sons, on the ground of
fraud and undue influence of the sons and of the mental incompe-
tency of the mother.

**FRAUD:** Confidential Relations.  Principle recognized that the doctrine
2  of confidential relations does not exist between a parent and adult
children to the extent that it will prevent either from dealing with
the other, or *per se* cause a transaction between them to be under
suspicion.

*Appeal from Adair District Court.*—J. H. Applegate, Judge.

MARCH 9, 1921.

Action in equity, to set aside certain instruments affect-
ing title to real estate conveyed by plaintiff to her sons, James
W. and Francis A. McKee.  Petition dismissed, and costs taxed
to the plaintiff.  Plaintiff appeals.—*Affirmed.*

*Carr, Carr & Cox* and *Guy A. Miller,* for appellant.

*Carl P. Knox,* for appellees.

De Graff, J.—The record in this case is quite voluminous,
and presents fact questions only.  We feel that no good purpose
will be served, nor will the literature of the law be enriched,
by any attempt on our part to review in this opinion the evidence
*in extenso.*

The learned trial judge, prior to the entry of the decree,
filed an exhaustive opinion, which embraces 28 pages of the
printed abstract of record; and, after a careful reading of the
evidence introduced upon the trial, we are satisfied with the
correctness of the conclusions announced.

I.   The primary question is whether the deed and the life

lease in controversy were executed by the plaintiff at a time when she was unable to comprehend the nature of her act and to understand the effect thereof.

1. DEEDS: fraud: undue influence: mental incompetency.

Plaintiff's husband died April 5, 1908, and left surviving him the plaintiff and nine children, seven daughters and two sons. The land in controversy, 124 acres, constituted the plaintiff's distributive share in the real estate of which her husband died seized.

On January 3, 1916, the plaintiff, as grantor, executed a deed to this land, conveying title to her two sons, defendants herein, and in said deed reserved unto herself a life estate. A contract of lease of her life estate was executed by her, March 7, 1916, to the defendants at an annual rental of $800. On the 9th day of February, 1918, a new lease was executed, increasing the rental to $1,000 a year, and at the same time the boys made a gift to their mother of $400, and Francis, in addition, gave her $100. On the day that the warranty deed was executed, a contract was signed by the parties to this action, in which the appellees obligated themselves to pay their sisters, daughters of the plaintiff, the sum of $12,500, within a year after the death of the plaintiff.

On February 14, 1916, an application was made for a loan of $15,000, to be secured by first mortgage upon 320 acres of land, which included the 124 acres deeded to the defendants. On the 30th day of March, 1916, a loan of $12,000 was made by the parties with whom application had been filed, and a mortgage was executed and signed by plaintiff and the defendants. The reduction in the amount of the mortgage was due to an objection on the part of the plaintiff to placing any mortgage on the 80 acres on which the defendants lived. Plaintiff stated at the time that there never had been a mortgage on that 80, and that there never would be as long as she lived.

The instruments in question are supported by good and sufficient considerations, and, unless the evidence sustains one or more of the grounds alleged by plaintiff to set aside these instruments, no court would be warranted in disturbing the rights of parties created thereby. The grounds alleged are: First, by reason of confidential relations between the plaintiff and defendants, the instruments are void, as the result of con-

structive fraud; second, that the instruments are the result of undue influence practiced upon plaintiff by defendants; third, that, by reason of her mental condition, due to epilepsy, plaintiff was incapable of understanding the nature and effect of the instruments executed by her.

At the time the deed was executed, plaintiff was about 53 years of age, James 25, and Francis 23. Upon the death of the husband and father, Alex McKee, the defendants being minors, plaintiff was appointed their guardian, managed their estates, and conducted the farm operations for a considerable period after her husband's death. She had the reputation of being a good, keen business woman.

It is also shown that she desired her sons to buy a part of the lands belonging to her husband's estate when the same were partitioned. Plaintiff claims to have no recollection of the execution of the deed; but it does appear that neither of the boys was present when plaintiff had the deed prepared, nor were they present at the time the deed was executed and acknowledged by her. There is no sufficient showing to justify a finding that the instruments in question were executed by the plaintiff under undue influence of the defendants, or either of them.

It is conclusively shown that the defendants, with the influence of her banker, could not induce the plaintiff to execute the mortgage to secure a $15,000 loan, when she discovered that the mortgage was intended to cover the old home 80; nor did she sign that mortgage until the 80 acres were omitted from the real estate pledged as security for the loan. It is quite remarkable that this transaction happened at a time when, as she now claims, she was in such mental condition that she was incapable of understanding business transactions.

It is fair to conclude, from the record before us, that she had a more tender regard and love for the boys than she had for the girls. This is quite apparent. We are not unmindful that, as the parent advances in years, the dependence may be reversed by the hand of time, and, with a failing of intelligence and an enfeebled frame, the parent naturally looks with confidence to her children for protection.

"The parent becomes the child, 'with the same dependence,

overweening confidence, and implicit acquiescence' which had made the other, in infancy, the willing instrument of the parent's desires." *Mott v. Mott*, 49 N. J. Eq. 192, 200.

But the facts and the principles stated in the foregoing case, and in *Sullivan v. Kenney*, 148 Iowa 361, are not applicable to the case at bar.

The record discloses that, prior to the transactions in question, the plaintiff was guardian for her boy Francis, and that, during the years of her guardianship of her other minor children, and the managing of their estates, and during the period of settlement of her husband's estate, she considered herself capable of conducting business affairs; and no one ever suggested that she was incapable or *non compos* until sometime after the execution and delivery of the instruments in suit. No one has sought to place plaintiff under guardianship at any time. The doctrine of confidential relations does not exist between a parent and adult children to the extent that it will prevent either from dealing with the other, or *per se* cause a transaction between them to be under suspicion. *Gregory v. Bowlsby*, 115 Iowa 327.

2. FRAUD: confidential relations.

There is nothing in this record upon which to predicate confidential relations, nor are there circumstances that constitute constructive fraud between the parties.

II. It is contended by appellant that, by reason of the epileptic condition of plaintiff, she was incapable of understanding and comprehending the effect of the transactions involved in this case. The evidence discloses that, at certain periods, the plaintiff was subject to epileptic attacks, but there is no sufficient showing that, at the times the instruments in controversy were executed, she failed to comprehend the effect of the transactions.

When these instruments were executed, Francis was living on the farm, and plaintiff lived in Stuart, with her daughter Minnie. There is a total absence of proof that the "master minds" in these transactions were the boys. She testified that she trusted her sons to do what was best for her; and this, we think, is what any devoted mother would say. There was no real dependency of the mother on her boys. Neither of her sons was a dominant personage in her business life. The most

that can be said is that she was more attached to her sons than to her daughters. The conferring of benefits by a parent upon a child is presumptively valid. *Curtis v. Armagast,* 158 Iowa 507. Nor is the fact that a parent is influenced by a prejudice against one of her children, or by a special fondness for one or more over others, sufficient to justify a court in undoing what is done by the parent. *Nowlen v. Nowlen,* 122 Iowa 541; *Baker v. Baker,* 169 Iowa 473.

We deem it unnecessary to lengthen this opinion by a discussion of the various phases or symptoms of epilepsy, for in so doing we would wander too far afield. The claim is made that plaintiff suffered from psychic epilepsy. Epilepsy, as generally defined, is a chronic disorder of the central nervous system, characterized by more or less frequently recurring convulsions, attended by a temporary loss of consciousness. The most striking symptom of psychic epilepsy is an alteration of consciousness; and during such periods, the mind is devoid of perception, comprehension, judgment, and memory. The psychic equivalent is a condition of epilepsy that apparently takes the place of physical spasms. The person becomes lost, confused, disorientated, losing the power of control over his acts, and may or may not be directed by others to perform certain things in regard to themselves or their surroundings. The psychic condition following an attack of epilepsy is manifested in automatism, dementia, or mania. Automatism is similar to sleepwalking, and is a subconscious performance that is similar in every way to a normal act.

It is the claim, as heretofore indicated, that plaintiff was suffering from psychic automative symptoms.

True, plaintiff testified that she had no recollection of having executed the deed, the mortgage, the contract by which defendants agreed to pay a stipulated sum to her daughters within one year after her death, or the first contract of lease of her life estate. The answer "I don't remember" precludes cross-examination, and whether the instruments were executed at times when she was conscious of the acts in which she was engaged must be found in the testimony of other witnesses.

Three medical experts testified that, after epileptic seizures

have passed, the person is left in a normal condition. One expert said that the spasms or seizures were soon over, and her mind soon cleared up, and she was herself again.

We will not attempt to set out the testimony which indicates the acts of the plaintiff which were peculiar, unusual, or subnormal. We are impressed, however, with the testimony that her mind was clouded at times, through the effect of her malady. These matters, as disclosed by the evidence, group themselves in three classes: (a) Failure to remember things that took place when she was not the principal actor. (b) Failure to recall things that she had done herself, such as having paid bills. (c) Conduct which constitutes automative action on her part, such as locking the doors of her home and getting ready for bed before dark, or leaving her home under circumstances that were not usual. These incidents may not be explained, except that they were done while she was in a condition of mind due to the effect of epileptic seizures.

The material question is whether the acts of the plaintiff in the execution of the instruments in question may be placed in the same category. The record contains numerous letters written by her to her children subsequently to the execution of the deed. In these she complains of the treatment accorded her by certain daughters, and in some is found a fulsome expression of affection for her sons.

In October, 1915, we find a written contract of sale of real estate by plaintiff to appellees; later, a mortgage to her and her release of said mortgage; her notice of said sale served on the tenant, November 29, 1915. During all of this period and thereafter, she had extensive business relations with her bank. In the following year, the instruments in controversy were executed. On April 22, 1916, defendants acknowledged a mortgage given by them to plaintiff as the guardian of two minor daughters, to secure each of the wards in the sum of $5,724.42; and a partial release of this mortgage was executed by plaintiff, December 28, 1916. Another mortgage was executed in December, 1917, in favor of a minor ward. The record discloses that, between January 3, 1916, and April 22, 1916, seven quite important instruments were executed by the parties, and plaintiff now claims to have no recollection of having executed six of

them. She did go to Attorney Knox on January 3, 1916, and requested him to prepare the deed and contract of that date. She arranged to meet him at the residence of Mr. Foltz that evening to sign same, and she did meet him at the place designated, and at the time appointed. Could all of these things have been done by an automaton, as a result of psychic epilepsy? She apparently was acting on her own initiative, and her acts involved intention, judgment, and memory.

It is quite clear that she did not wish to have her daughters know of these transactions. She had previously talked about making such papers and deeding her land to her sons. A letter written by her on February 18, 1918, indicates that she was able to recall a part of the transactions at least. She did refuse to execute a $15,000 mortgage, and gave a very good reason for not doing so. She surely at that time was exercising her own will and judgment.

During 1916 and 1917, she accepted rent from the defendants under the lease of her life estate in the land. During her stay at St. Paul, from June to August, 1917, her letters to the boys indicated that she was very much concerned about furnishing money for the girls, who were to attend school the ensuing year. All of her letters indicate the working of a normal mind. She does not claim that the execution of the new lease to defendants on February 9, 1918, was made by her in an automative way, but claims that she understood it was for a lease of five years only. She was able to read and to write, and the presumption is that she knew what she was signing. Prior to the execution of this lease, she had had negotiations with Attorney Sever, of Stuart, with a view to terminating the first lease. She also talked over the matter with her brother-in-law, Sam McKee. We must presume that her advisers acted honestly with her and for her interest, and that the agreement that was reached was in accord with the understanding of the parties. Not until February, 1918, is any complaint made by her as to the transactions involved herein, and this appears to be a little less than a year after she claims to have learned of the existence of the deed. Her letters to the boys, written while she was in St. Paul, contrasted with her subsequent complaint, make it clear that

some outside influence was causing plaintiff to regret the action taken.

The trial court gave this case exhaustive study and reflection. We have read the record with care. The conclusion reached by the trial judge is sound, and the decree entered is, therefore,—*Affirmed*.

EVANS, C. J., PRESTON and STEVENS, JJ., concur.