ROECHER, Appellant, *v.* COMMERCIAL NATIONAL
BANK, Respondent.

(No. 6,613.)

(Submitted May 9, 1930.  Decided June 20, 1930.)

[289 Pac. 388.]

572

*Mr. Walter Aitken,* for Appellant, submitted an original and a reply brief and argued the cause orally.

574

*Mr. George Y. Patten, Mr. Justin M. Smith, Mr. W. S. Hartman* and *Mr. Roy M. Keister,* for Respondent, submitted a brief; *Mr. Patten* and *Mr. Hartman* argued the cause orally.

MR. JUSTICE FORD delivered the opinion of the court.

This is an action in conversion brought by plaintiff as administrator of the estate of Nelson Story, Sr., deceased, against defendant for the recovery of certain personal property, hereafter referred to as the "trust securities."

The complaint is in the usual form in this character of action. Defendant, by answer, admitted the possession of the property described in the complaint at the time of the death of Nelson Story, Sr., and alleged that it received the property pursuant to the terms of two certain agreements dated December 14, 1923, attached to and made a part of the answer, one between Nelson Story, Sr., and T. B. Story, and the other between Nelson Story, Sr., and Nelson Story, Jr., and that, pursuant to the terms of the agreements, it delivered the trust securities to Nelson Story, Jr., and Katherine F. Story. Demand by plaintiff for possession before the commencement of the action is admitted and liability denied.

Plaintiff demurred generally and specially to the answer, and moved to strike certain portions thereof. The demurrers were overruled and the motion to strike was denied. Thereafter plaintiff replied, putting in issue the execution of the agreements and the receipt and delivery of the trust securities as alleged in the answer.

The cause was tried before the court with a jury, and, at the close of plaintiff's case, defendant's motion for a nonsuit was granted. Judgment was accordingly entered, from which plaintiff appeals.

The validity and effect of the agreements above referred to form the basis of this controversy. The agreement between Nelson Story, Sr., and T. B. Story relates to certain securities of the value of $72,700, and recites that several years before

Nelson Story, Sr., distributed a large portion of his property to his son, T. B. Story, and as a result the latter became the absolute owner of such property; that at the same time, Nelson Story, Sr., desiring to protect T. B. Story and his family from unforeseen financial misfortune, and further with the idea of providing an income to Nelson Story, Sr., if unforeseen misfortune should come to him, he caused T. B. Story to agree "to turn over" to Nelson Story, Sr., the sum of $500 per month during the natural life of Nelson Story, Sr., or until such time as he should relieve T. B. Story from the obligation, and that pursuant to such understanding a contract was entered into between the parties on February 25, 1913, to carry out the understanding, and that under that contract T. B. Story had, on the first day of each month from March 1, 1913, to and including the first day of October, 1920, paid to Nelson Story, Sr., the sum of $500. The contract then recites:

"And whereas in said contract, above referred to, it was further understood between said parties that the party of the first part would safely keep all sums of money paid under said agreement during the natural life of the party of the first part, for the benefit of the party of the second part, or his family, and said contract further provided that said sums paid under said contract by said party of the second part should, at all times, be considered the property of the party of the second part, or his heirs and assigns, to be returned to the party of the second part or his family at the demise of the party of the first part, or at any time during the life of the party of the first part if he saw fit to return said money to the party of the second part, but it was further understood that the party of the first part should at all times, or until the party of the first part should relieve the party of the second part from said contract, or at the demise of the party of the first part, as hereinbefore stated, have the right to the income accruing from said fund for his own private use, and in consideration therefor the party of the first part would pay the annual income tax thereon."

The agreement then recites that on the first day of June, 1917, the parties entered into an additional agreement to the effect that T. B. Story should pay to Nelson Story, Sr., on the first day of June and January of each year thereafter, during the life of Nelson Story, Sr., in addition to the above-mentioned payments, the sum of $4,437.50, which payments should be held by Nelson Story, Sr., subject to all the terms and conditions of the agreement relating to the $500 payments; that T. B. Story had paid to Nelson Story, Sr., under the two agreements, the sum of $72,625; that the parties had agreed to partially reform the former contracts, and in lieu thereof substitute the agreement under consideration, ''which shall be considered by the parties hereto as governing their rights and liabilities growing out of said understanding''; that T. B. Story in the past had borrowed sums of money from his wife, Katherine F. Story, in excess of the principal sum named, and agreed that such fund be turned over to Katherine F. Story rather than to himself, in order that she might be partially indemnified for such loans, and proceeds:

''Therefore, in consideration of the premises, it is mutually agreed between said parties that the party of the second part shall no longer make said payments of $500.00 per month, or of $4,437.50 semi-annually, as above stated, and that the party of the first part is this day turning over to the Commercial National Bank, of Bozeman, Montana, certain securities aggregating in value the sum of $72,625.00, which represents the $72,625.00 which has been paid by the party of the second part to the party of the first part;

''That the party of the first part shall, during his natural life, receive all of the income necessary for his personal use and that of his wife, Ellen Trent Story, from said securities with the understanding, however, that he shall pay the income tax thereon during said period;

''It is also provided that should the wife of the party of the first part, to-wit, Ellen Trent Story, survive him, then she shall receive so much of the income from said securities

as may be necessary for her personal use, so long as she shall live, she paying the income tax thereon during said time.

"Upon the demise of the party of the first part, or of the said Ellen Trent Story, if she should survive the party of the first part, then the said Commercial National Bank is directed to turn over to the said Katherine F. Story, or to her executors, administrators or assigns, all of said securities as referred to in this agreement, the same having become, in fact, her individual property.

"It is further mutually agreed between the parties hereto that, should an exigency arise whereby the said party of the first part, or the said Ellen Trent Story, may require for their use a larger sum than the interest from said principal, as above referred to, they or either of them, shall have the right to take from said principal fund or securities such an amount as is necessary to maintain them in their present station of life and manner of living."

The agreement between Nelson Story, Sr., and Nelson Story, Jr., is identical with the one just referred to, except as to names, the amount paid by Nelson Story, Jr., the description of the securities, and provides that, upon the death of Nelson Story, Sr., the securities should be delivered to Nelson Story, Jr., or to his executors, administrators or assigns, and was signed by him subsequent to December 14, 1923.

The testimony shows that on the morning of December 14, 1923, Nelson Story, Sr., in company with T. B. Story, came to the bank of defendant, and requested Charles Vandenhook, then vice-president, and now president, of the bank, to stay until he called him. During the afternoon Vandenhook, by request, went to the residence of Nelson Story, Sr., who stated to him that he was desirous of turning over to the bank certain securities to be held by it as trustee for Nelson Story, Jr., and Katherine F. Story, and that he would give him the key to his safety deposit box; that T. B. Story had a list of bonds to be taken out of the safety deposit box, which bonds would be a part of the securities to be turned over to the bank, and that such securities would be the ones to put into the

trust box; that Nelson Story, Sr., gave to him a certificate of deposit of the Commercial National Bank for $10,000, a certificate of stock in the same bank for 200 shares, and the key to the safety deposit box, besides other securities not here involved. At the same time Nelson Story, Sr., discussed the contents of the agreements and the reason for making them; he stated that he was turning over the securities to the bank to be held for Nelson Story, Jr., and Katherine F. Story; that Nelson Story, Jr., and T. B. Story had been paying him $500 a month for many years, and that he had decided to discontinue the payments and to reimburse the sons for the payments made in the past, and he wanted the bank to act as trustee. Nelson Story, Sr., signed the instruments in the presence of the witness and delivered them to him.

Later, on the same day, T. B. Story came to the bank and signed the agreement; he had a list of the securities which were to be put in the trust box in the bank. The securities were taken from the safety deposit box of Nelson Story, Sr., and witness took possession of them, and they were put together in a separate box. A receipt for the securities was given by the bank to Nelson Story, Sr. After the delivery of the key to the safety deposit box by Nelson Story, Sr., neither he nor any member of his family had a key to the deposit box; only officers of the bank had access to that box. The securities at all times during the life of Nelson Story, Sr., were kept intact in the trust box, except such changes as were made necessary by the redemption of bonds which were a part of the trust securities. The income received from the trust securities was paid to T. B. Story, as the agent and representative of Nelson Story, Sr., but the principal remained intact.

In June, 1924, and again in October, 1925, Nelson Story, Sr., inquired about the trust securities. Ellen Trent Story died in February, 1924. Nelson Story, Sr., died on March 10, 1926, and thereafter, on March 24, 1926, Mr. Vandenhook took the trust box to the office of Geo. Y. Patten, attorney for the bank; the trust securities described in the agreement between

Nelson Story, Sr., and T. B. Story were delivered to T. B. Story, representing Katherine F. Story, and the stock certificate representing 200 shares of the Commercial National Bank was delivered to Nelson Story, Jr. T. B. Story and Nelson Story, Jr., retained possession of the securities during the hour or more the parties remained in Mr. Patten's office. At that time an action involving title to the property was impending, and, at the voluntary suggestion of T. B. Story or Nelson Story, Jr., the securities were then returned to Mr. Vandenhook, to be held for the protection of the bank until the anticipated controversy should be settled, and defendant has since retained possession of all the property. Mr. Vandenhook handled the property without reference to any of the other officers of the bank; no regular bank record of the property was kept; the only record made was in an account-book which was kept in the box with the securities.

It is contended by counsel for plaintiff that, by reason of the provisions of the trust agreements which read that, "should an emergency arise whereby the said party of the first part [Nelson Story, Sr.] or of the said Ellen Trent Story, may require for their use a larger sum than the interest from said principal, as above referred to, they, or either of them, shall have the right to take from said principal fund or securities such an amount as is necessary to maintain them in their present station of life and manner of living," Nelson Story, Sr., retained ownership and control of the trust securities, with the right at any time to take the whole or any part of the principal; that there was not a sufficient transfer of the trust securities to the trustees, and the transaction amounted to an ineffectual attempt to make a testamentary disposition, and a valid trust was not created. This contention is founded upon the erroneous assumption that Nelson Story, Sr., was on December 14, 1923, the date of the trust agreements, the owner of the property therein described, and cannot be sustained.

"Parties who are competent," said the court in *Union Bank & Trust Co.* v. *Himmelbauer*, 56 Mont. 82, 181 Pac.

332, 335, "have the right to fix the terms and conditions of their contracts, so long as in doing so they do not violate public policy or some express provision of law," and, when the words of a contract are unambiguous, interpretation may not be resorted to. (*Frank* v. *Butte & Boulder M. & L. Co.*, 48 Mont. 83, 135 Pac. 904.) "The language used is to be resorted to in the first instance, but the conclusion to be reached depends, not upon the verbal clarity of the particular sentences or paragraphs, but upon the view to be taken of the contract in its entirety." (*Butte Water Co.* v. *City of Butte*, 48 Mont. 386, 138 Pac. 195, 197.) A contract must be interpreted so as to give effect to the intention of the parties at the time of contracting (sec. 7527, Rev. Codes 1921) ; the language used is to govern its interpretation, if clear and it does not involve an absurdity (sec. 7529, Id.), and the intention of the parties is to be ascertained from the writing alone, if possible (sec. 7530, Id.). The whole of a contract must be taken together "so as to give effect to every part, * * * each clause helping to interpret the other" (sec. 7532, Id.), and "a contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done, without violating the intention of the parties." (Sec. 7534, Id.; *State* v. *Rosman*, 84 Mont. 207, 274 Pac. 850.)

In the agreements before us the parties appear to have been competent and capable of contracting. We think the language used is clear and explicit, the intention of the parties certain, and the construction of the agreements involves no difficulty.

From the recitals contained in the trust agreements it appears that by the terms of the contracts of 1913 and 1917, certain property had been conveyed to the two sons, and in consideration of which, Nelson Story, Sr., desiring to protect his sons "from unforeseen financial misfortune," and further with the idea of providing an income for himself, had required the two sons to make certain payments for such period of time as the father should require. The money so

paid was to be safely kept by Nelson Story, Sr., during his natural life for the benefit of the sons or their families, and the sums so paid should, at all times, be considered the property of the sons, or their heirs or assigns, to be returned to them or their families at the demise of Nelson Story, Sr., or at any time during his life if he saw fit to return the money to them.

We think it is clear that the payments made by the sons to their father were to be retained by him as trustee for the benefit of the sons and their families. It was contemplated that the father might terminate the trust at any time he desired by returning to the sons the amounts paid by them under the agreements. By the agreements of December 14, 1923, the trusts then existing were ended, and the trust property, which had at all times been the property of the sons, was by mutual consent, and evidenced by the trust agreements of that date, delivered to defendant. New trusts were created with defendant as trustee, for the benefit of Nelson Story, Sr., and Ellen Trent Story, his wife, if she survived him, during their lives, and, after the death of both of them, for Nelson Story, Jr., and Katherine F. Story.

Taking the trust agreements in their entirety, it is manifest that the purpose of Nelson Story, Sr., was to protect his sons and their families "from unforeseen financial misfortune," and likewise to provide an income for himself and wife. Upon the death of Nelson Story, Sr., the trust terminated; the trust securities were no part of his estate; and plaintiff is not entitled to their possession.

Upon the trial plaintiff offered to prove that defendant ▆ had applied for, and received from, the Federal Reserve Board of the United States a permit to act as trustee, and that a permit had been granted; that on December 14, 1923, it had not acted under the permit, nor had it organized any trust department under the permit, and was not authorized to act as trustee or in any fiduciary capacity under the National Bank Act; that the trust agreement was never referred to any officer except the vice-president, nor acted upon by the

board of directors of the bank, and that the trust was not accepted by the bank. The court excluded this line of testimony, and counsel predicates error upon the rulings. The uncontradicted evidence shows that the trust was created and accepted by the defendant, and that it has been fully executed. We do not think the question of the right of the bank to act was material, and the court properly excluded the offered evidence.

Counsel contends that the court erred in entering judgment "on the merits." In the case of *McKeon* v. *Kilduff*, 85˙ Mont. 562, 281 Pac. 345, 348, Mr. Justice Galen, speaking for the court, said: "A nonsuit should be granted only when the facts are clear and undisputed, and from them it is apparent that the plaintiff cannot recover as a matter of law. (*Nord* v. *Boston & Mont. etc. Min. Co.*, 30 Mont. 48, 75 Pac. 681.) The court will grant a nonsuit in cases where it would grant a new trial, if a jury should bring in a verdict in favor of the plaintiff. (*Garver* v. *Lynde*, 7 Mont. 108, 14 Pac. 697.) And where the plaintiff's own evidence shows that he has no right of recovery in application of the law to the facts, it is proper for the court to grant a nonsuit. (*Cummings* v. *Helena & Livingston S. & R. Co.*, 26 Mont. 434, 68 Pac. 852.) However, it is never proper for the court, upon granting a nonsuit, to enter a judgment on the merits, since nothing is determined, except that the plaintiff has not proved his case as alleged. (15 Cal. Jur., p. 131.) A judgment of nonsuit is not, as a general rule, a judgment on the merits, and therefore it is no bar to another suit upon the same cause of action, and this applies even when the nonsuit is compulsory, as for want or insufficiency of the plaintiff's evidence. It 'is like the blowing out of a candle, which a man at his own pleasure lights again.' (34 C. J., pp. 781, 782.)"

Finally, counsel insists that this court will review a cause only upon the theory on which it was tried in the lower court, and that in that court the principal and only issue presented was "where the legal title to the property rested at the date of Nelson Story, Sr.'s death on March 10, 1926; and

if by the contracts in evidence, and the acts of the parties in practical construction thereof, the legal title did not pass from Nelson Story, Sr., to the bank, it was in him when he died and passed by operation of law to his personal representative." In support of this argument plaintiff had certified by the trial judge and filed herein "Defendant's Brief on Demurrer to Answer and Motion to Strike."

This brief is not a part of the record and will not be considered; we cannot go outside of the record which has been duly certified as required by our statutes. We have carefully considered the entire record and there is not anything to indicate that the case was tried, considered or determined by the lower court on a theory different from that adopted by us.

However, the determinable question was the construction of the trust agreements, and it is clear that the lower court reached the correct conclusion; but if it did appear that the court adopted a different theory, the judgment would not be disturbed, since the doctrine "wrong reason, right conclusion," would apply. "Admitting that the reasons assigned for, and by which the court was governed in making its ruling, are erroneous, yet it makes no difference if the ruling itself is proper and correct. It matters not by what process or method of reasoning, or by what form of argument or manner of deduction, whether true or fallacious, a conclusion is arrived at, provided the conclusion itself is right." (*McMullen* v. *Armstrong,* 1 Mont. 486; *Whitcomb* v. *Beyerlein,* 84 Mont. 470, 276 Pac. 430; *State* v. *Great Northern Utilities Co.,* 86 Mont. 442, 284 Pac. 772.)

For the reasons stated, the judgment is modified by striking therefrom the words "on the merits," and as modified it is affirmed. Defendant shall have its costs on appeal.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS and GALEN concur.

MR. JUSTICE ANGSTMAN, being absent, did not hear the argument and takes no part in the foregoing decision.

Rehearing denied July 7, 1930.