ROECHER, Administrator, Appellant, *v.* STORY, Respondent.

(No. 6,819.)

(Submitted October 9, 1931.  Decided November 19, 1931.)

[5 Pac. (2d) 205.]

Mr. *Walter Aitken* and Mr. *Romaine L. Hogan,* for Appellant, submitted a brief; Mr. *Aitken* argued the cause orally.

32

*Mr. Walter S. Hartman, Mr. Roy M. Keister* and *Mr. George Y. Patten,* for Respondent, submitted a brief; *Mr. Hartman* and *Mr. Patten* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This action was brought by the plaintiff as administrator of the estate of Nelson Story, deceased, against the defendant for an accounting.

It is alleged in paragraph III of the complaint that on September 4, 1923, decedent owned real and personal property in Gallatin county of the value of $200,000 or more, which yielded a monthly revenue of $1,000 or thereabouts; that on that date the decedent being then of the age of eighty-five years, and in feeble physical condition, appointed his son, the defendant, his trustee and agent to look after, manage and attend to his business and affairs, to collect the income from the property, and to deposit the money collected to the credit of his father in the Commercial National Bank of Bozeman, and to pay the necessary expense of conducting and managing the business with checks signed in the name of his father against his father's bank account, and to do any and every thing that the father could or should do in the premises; that subsequent to his appointment as agent and trustee and on the twenty-fifth day of February, 1924, the defendant procured from his father a written power of attorney, and thereafter continuously until the death of his father defendant acted as the agent and trustee of his father under the written power of attorney. That as agent and trustee for his father the defendant collected during the period from September 4, 1923, to and including March 10, 1926, the date of the father's death, about $60,000 of the father's money, all of which he did not deposit to the father's account, but that a large amount thereof, the exact amount being unknown to plaintiff, was expended and used by defendant in an improper and unauthorized manner. That the court, sitting in probate, theretofore had issued a citation directed to defendant requiring him to account, and that in response thereto he had filed "an answer, statement and account" without any vouchers; that certain items which are specifically mentioned therein

were unauthorized and not for the benefit or protection of the father; some were made after the father's death; some were made for the personal benefit of the defendant and members of his family; that defendant has not complied with the demand made upon him for an account and vouchers, and that plaintiff objects to and rejects each and every item of the account and statement of which no voucher is presented; that defendant has exercised dominion and control over his father's books, papers, documents, bank statements, memoranda, and the like since the latter's death, and has refused plaintiff's demand therefor and has denied possession of any of such property.

The complaint concludes with a demand for judgment against defendant for the specific sums of $21,828.26 and $4,000, respectively, for a general accounting by defendant with a production of books, papers, vouchers, and any other and all documents relating to his administration as trustee and agent of his father during the period stated.

A demurrer to the complaint was overruled and the defendant answered. He admitted the ownership by his father on the fourth day of September, 1923, of the property described in paragraph III of the complaint, the issuance of the citation, and the filing of an answer, statement and account in response thereto, which he alleges was true and correct in every particular. He asserts that on September 4, 1923, he found his father suffering from a temporary illness which continued until November, 1923, and alleges that at his father's request he proceeded to collect the income from the father's property, which he deposited in the bank; that from that time on, at his father's request, he continued to collect rents and other income, to deposit the same, and to pay accounts against his father by checks, except as to matters which the father looked after himself; avers that such services were similar in character to those which had been performed by him for his father since defendant had become of age; that he rendered the services as his father's trusted son, and not as agent, trustee, or attorney in fact; that he had never acted under the power of

attorney given him by his father. In considerable detail it is alleged that following February 19, 1924, the defendant and his wife, at his father's request, took charge of and managed the household and affairs of the father, and for the payment of the necessary expenses incurred had used the income from the father's property, as well as income from "trust" property belonging to defendant's wife and Nelson Story, Jr., and from the "bill of sale" and "indorsement" securities which belonged to defendant.

Further recitation of the pleadings will not be useful.

The issues having been made up, the court proceeded with the taking of testimony. The court was patient and considerate. A wide latitude was allowed, probably greater than the pleadings warrant. To make out his case the plaintiff called the defendant to the stand, and examined him at great length; his testimony comprises 425 printed pages.

From the evidence it appears that on the 4th of September, 1923, Nelson Story was about eighty-five years of age. He had been ailing for some days from an infection of the neck, which he had attempted to treat, unsuccessfully, with those favorite remedies of the pioneer—he was himself an early pioneer—coal oil and liniment. On that day his son Byron, familiarly called Bine, paid his father a visit and was requested by him to figure up a grocery account and to draw a check for it. This defendant did. And at his father's request he collected the rentals thereafter; this he had done in former years for considerable periods, but not lately. The father drew checks until the middle of September, when he became physically incapacitated for business and so remained until the forepart of November. On the 30th of September, physicians lanced Mr. Story's neck, placing a drain tube in the incision; after that the old gentleman improved slowly. On November 15 he was up and about. During the latter part of November he was riding around the country with defendant and in December was in his usual health. During December he came in from a forty-five mile drive, feeling so well that he told his wife he was as good a man as he ever had been.

Mr. Story was solicitous of the welfare of his children. In 1913 he had taken steps to protect his sons Nelson Story, Jr., and defendant, and their children, from "unforeseen financial misfortune" and had entered into contracts with them accordingly; the contracts were amended in 1917, and again on December 14, 1923.

In 1921 Mr. Story executed a will in which he named his wife and his four children, Rose Story Hogan, Nelson Story, Jr., Thomas Byron Story, defendant, and Walter Perry Story; therein he said he had given his sons already more than their distributive shares of his estate would be in the event of his death without a will. In this will his wife was given a life estate in all of the property of which he should die seized or possessed; after her death one-half of his property was to go to his son Walter Perry Story, as trustee, for the life of his daughter, Rose Story Hogan, for her benefit, and after her death to her children; the other half was to go to Katherine Ferris Story, wife of the defendant, as trustee, for the period of her life and thereafter to her children, but extensive powers were granted to her.

On December 14, 1923, the father executed the contracts which were before this court in *Roecher* v. *Commercial National Bank*, 87 Mont. 570, 289 Pac. 388. The securities mentioned in these contracts are referred to in this case as the "trust" securities. On the same day he signed a bill of sale, which defendant had prepared some days before, at his father's request, in the presence of Hubert D. Bath, an attorney at law, and delivered the same to defendant in Mr. Bath's presence. It conveyed to defendant Bozeman Deaconess Hospital bonds, shares of stock in the Montana Flour Mills Company, and Special Improvement bonds, of the city of Bozeman, of the aggregate value of $60,700. These are referred to as the "bill of sale" securities. On the same day, in the presence of the witness Vandenhook, he indorsed and delivered to defendant the note of Vandenhook, in amount $4,000, and forty shares of stock in the Belgrade State Bank. He also indorsed a certificate of deposit issued by the Belgrade State Bank in amount

$1,400, but this he did not deliver to the defendant until the latter part of January, 1924. These are the "indorsement" securities.

The father wished to convey the residence property in Bozeman, which was built in 1888, costing $100,000 and which at the time of the trial could not have been replaced for $200,000, to the defendant, but he refused to accept it, saying his sister Rose wanted it and it should be given to her. The father caused to be drawn a deed conveying the property to Walter Perry Story, which was dated December 8, 1923, and acknowledged December 14, 1923, before Mr. Bath as a notary public, and on the fourteenth in his own handwriting wrote a letter to Walter in which he said that he wanted Walter "at the proper time to deed this property to my son Thomas Byron Story, or a member of his family." He said that Bud, meaning Nelson Story, Jr., had a good home and "Rose will never live in Montana." He continued: "Bine has to look after my business now—and will in the future— as to mother's surviving very long—or which will die first is not to be known at present—and if either dies—Bine must care for the survivor and look after the property, and keep the house and he is our main support at the present time and has been in the past." This letter defendant crumpled and cast away, but the father retrieved it and it was found in his desk after his death. Mr. Story did not desire the property to go to his daughter; he wanted it to remain in the family name, for, on the same day, without defendant's knowledge, he wrote another letter to Walter in which he inclosed the deed, saying: "I am deeding this property to you as I wish it to be kept in my family name."

There is not even a scintilla of evidence in the record tending to show that the father on the 14th of December, 1923, was not in the full possession of his mental faculties or that he was not then completely in the saddle with respect to the disposition of his property.

Mr. Story was attacked with a cold on December 29, 1923, and a few days later took to his bed. Nurses were in attend-

ance. He got better but was ailing until along in the spring. During this period he was "all right mentally but not physically."

On the 9th of February, 1924, Mrs. Nelson Story, Sr., died. Ten days later, at his father's request, defendant with his wife and children moved to the residence of the father.

What happened to the deed which the father sent to his son Walter on December 14 is not clear upon the record. On February 23, 1924, he made another deed conveying the property to his son Walter. This was returned by Walter to the defendant, who placed it of record. About the same time the father conveyed valuable business property in Bozeman to his daughter Rose Story Hogan. On the 23d of February, 1924, he made the following indorsement upon his will: "Bozeman, Montana, February 23, 1924. Having previously disposed of my personal property, I am this day disposing of my real estate, therefore leaving no will. Any will or wills heretofore made by me · are hereby revoked, nullified and made void."

It would seem that the father had retained a life estate in the real property heretofore mentioned, as he had in the contracts of December 14, 1923, described in *Roecher* v. *Commercial National Bank,* supra. In those it was provided that the father should receive during his natural life all of the income necessary for his personal use from the securities therein named, with the understanding that he would pay the income tax thereon during that period. On February 25, 1924, the father executed to defendant a general and comprehensive power of attorney.

Defendant continued to collect the rentals from the real estate, kept the buildings in repair, paid the taxes, and managed the same until the father's death, which occurred on March 10, 1926. During that period he collected the income from the trust securities mentioned in the contract of December 14, 1923, the bill of sale securities, and the indorsement securities.

On the 4th of September, 1923, the father had a bank account with the Commercial National Bank in an amount over $14,000. After that date defendant deposited the rentals and the income from the personal property in his father's account with that bank and checked out the same in his father's name at will. He also checked against his wife's account at pleasure. Later he opened an account which he called "K. F. Story, Special," in which he deposited some of the rentals and income.

Being told by the attending physician that his father was about to die, the defendant drew out from the father's account all the money remaining therein. He did this, he said, in order that he might have money to finance the expense of the last illness and funeral.

After the defendant's family moved to the family residence, the major part of the expenses of running the establishment was drawn from the father's bank account, but this was at the father's request. The father desired to pay all the expenses, but a portion of them were defrayed by the defendant and his wife, Katherine Ferris Story. At all times the father was cared for with the greatest solicitude by the defendant and his wife. They employed the best nurses obtainable and did their utmost to provide for the father's comfort.

As has been said, Mr. Story improved during the spring of 1924 and he was much better in the summer until August, when an old physical ailment recurred, and from then on he declined. In 1925 it was apparent that dissolution was slowly, but certainly, approaching. In November, 1925, he was taken to Los Angeles, where he died March 10, 1926. But over this entire period the evidence is that he was in the full possession of his mental faculties.

In plaintiff's brief much is made of the fact that within a few weeks after September 4, 1923, defendant burned many of his father's papers. Defendant explained that the old gentleman had permitted a mass of papers, consisting of old letters, advertisements, and the like, to accumulate in his desk. The desk was cluttered up; there was practically no

space available for use. He did not remember whether his father was present while he was cleaning up the desk; "he might have been sitting right there with me; * * * what I burned up there was stuff that was absolutely of no account at all," defendant said. There was no contradiction of this testimony.

Presumably for the purpose of showing that some of the transfers between father and son were not bona fide, counsel for plaintiff introduced in evidence certified copies of income tax returns made on behalf of Nelson Story, Sr. Those for the years 1924 and 1925 show income received from rentals, stock of domestic corporations, and bonds. The fact is that Mr. Story did not own the trust, bill of sale, or indorsement securities after December 14, 1923, if the contracts and transfers made on that day were valid, and he did not own any real estate after February 23, 1924, if the deeds he then made were valid. The returns were verified by defendant, the reason assigned in the 1924 return being that Nelson Story, Sr., was "so old and infirm, cannot write," and in the 1925 return, verified on the day the father died, "88 years of age, invalid." As explanatory of this, defendant said that what he meant was that his father was not able to make out the several returns; and in explanation of his having included income from certain bonds and securities he said that "under the contract with father he was to pay the income taxes on certain of them, and they should have been included that way. But he was receiving the income on the bill of sale, and on the trust fund, as far as he needed it, and in California when I made out the income tax there I just put in the money from the bill of sale for him. As a matter of fact he eventually got it all. And whoever received the income should pay the tax on it, and I put it in that way. As a matter of fact I paid the tax myself for him that year." It must be admitted that this was a clumsy way of doing, even upon defendant's own theory. His explanation of the use of the several bank accounts was that it was merely a matter of convenience. With respect to the use of his father's bank account he said that

the bank statements went to his father, who knew just what defendant was doing with respect thereto from September 4, 1923, up to the date of his death.

Mr. Vandenhook testified that as late as September or October, 1925, Mr. Story asked what amount of the securities which the bank was holding in trust had been used, and he answered "only the income," to which Mr. Story said: "Do you mean to tell me that they have used none of the principal to keep me here and pay all of these expenses?" and Vandenhook replied: "Mr. Story there has been none of the principal or the trust money or securities left with us—taken or used in any way."

The court adopted the findings proposed by the defendant. Some essential findings are that the trust securities mentioned in the contract of December 14, 1923, were in fact the individual property of Katherine F. Story, the wife of defendant; that the "indorsement" securities and the "bill of sale" securities were the property of the defendant; that the defendant should be charged with items totaling the sum of $45,152.87 and should be credited with the net sum of $51,774.02, the difference between the two sums having been contributed by the defendant for the use of the father from income from the trust, bill of sale, and indorsement securities; that the defendant has fully and fairly accounted for all moneys received for and dispensed on account of his father; that it was at the request and in accordance with the wish of the father that the defendant looked after the father's business and affairs during the period of time elapsing from September 4, 1923, to March 10, 1926; that in so acting the defendant was prompted only by a sense of filial duty and had no personal or selfish motives; and that in all that he did in looking after the business and affairs of his father during that period of time the defendant acted in good faith and with a view only to promote the personal welfare and best interests of his father. Accordingly the court entered judgment to the effect that the plaintiff take nothing and that the defendant have his costs and disbursements in the action.

42

There is not any allegation of fraud or undue influence in ▮ plaintiff's complaint, nor was the case tried upon that theory. Plaintiff's theory is that the son ingratiated himself with his father and took advantage of him. It is insisted that a relation of trust and confidence, and hence a fiduciary relation, existed between father and son. Upon that premise counsel for plaintiff insist that it must be presumed that the acquisition of the father's property by the son was got by undue influence exercised by the son over the father and without sufficient consideration. They especially rely upon the rule that, "where an antecedent fiduciary relation exists, a court of equity will *presume* confidence placed and influence exerted; where there is no such fiduciary relation, the confidence and influence must be *proved* by satisfactory extrinsic evidence; the rules of equity and the remedies which it bestows are exactly the same in each of these two cases." (2 Pomeroy's Equity Jurisprudence, 4th ed., sec. 951; *Emerson-Brantingham Implement Co.* v. *Anderson*, 58 Mont. 617, 194 Pac. 160, 165; *In re Cuffe's Estate*, 63 Mont. 399, 207 Pac. 640.) From this doctrine we have no disposition to depart. Mr. Pomeroy continues: "The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case, and grants relief 'where influence is acquired and abused, or where confidence is reposed and betrayed.' It is specially active and searching in dealing with gifts, but is applied, when necessary, to conveyances, contracts executory and executed, and wills."

"The presumption referred to by Mr. Pomeroy arises only when it is shown that antecedent relations between the parties in fact existed. When the presumption does arise, the burden shifts to the adverse party to repel it by showing that the negotiations resulting in the contract were conducted at arm's length, uninfluenced by the superior position held by him. The law recognizes a distinction between what may be deemed 'due influence,' which is entirely legitimate, and what the statute denounces as 'undue influence.'" (*Emerson-Brantingham Implement Co.* v. *Anderson*, supra.)

It does not follow necessarily that the bare fact of relationship between a parent and an adult child is of itself sufficient to create a fiduciary relation and to shift the burden of proof upon the child who may be the recipient of the father's bounty, to sustain the bona fides of a transaction that is called in question. "The mere relationship of parent and adult child does not prevent the parties from dealing with each other, and such relationship does not itself, without more, place the burden upon the adult child to establish the bona fides of the transaction (*Gregory* v. *Bowlsby,* 115 Iowa, 327, 88 N. W. 822; *McKee* v. *McKee,* 190 Iowa, 1357, 181 N. W. 672)." (*Shaffer* v. *Zubrod,* 202 Iowa, 1062, 208 N. W. 294, 295.)

Ordinarily, "business dealings between parents and children, █ and other near relatives, are not *per se* fraudulent; they must be treated just as are the transactions between ordinary debtors and creditors, and where the bona fides of their transactions is attacked the fraud alleged must be clearly proved." (*Reehling* v. *Byers,* 94 Pa. 316; *Coleman's Estate,* 193 Pa. 605, 44 Atl. 1085.) To consider a child disqualified to take a voluntary gift from his father without consideration on account of their relationship is assuming a principle at war with all filial as well as parental duty and affection. (Adaption of the language of Judge Story quoted in *Coleman's Estate,* supra.)

In *Mackall* v. *Mackall,* 135 U. S. 167, 34 L. Ed. 84, 10 Sup. Ct. Rep. 705, 707, Mr. Justice Brewer quoted the following from the notes of the case of *Small* v. *Small,* 4 Greenl. (Me.) 220, reported in 16 Am. Dec. 259: "Influence gained █ by kindness and affection will not be regarded as 'undue,' if no imposition or fraud be practiced, even though it induce the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. (*In re Gleespin's Will,* 26 N. J. Eq. 523.) * * * Confidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence. (*Lee* v. *Lee,* 71 N. C. 139.) * * * It

would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary dispositions, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them.''

"The law recognizes the right of every person, when not hindered by personal incapacity or some provision of law, to act according to his own free choice." (*Emerson-Brantingham Implement Co.* v. *Anderson*, supra.)

At this point it is important to ascertain as best we may what were the actual relations between Mr. Story, the father, and the defendant, his son. To what extent was defendant his father's trustee? Section 7882, Revised Codes 1921, declares that every person who voluntarily assumes a relation of personal confidence with another is deemed a trustee, as to the person who reposes such confidence, or over whose affairs he, by such confidence, obtains any control. That the father relied upon the son and placed confidence in him is clear. But the doctrine of confidential relations does not exist between a parent and adult children to the extent that it will prevent either from dealing with the other, or *per se* cause a transaction between them to be under suspicion. (*McKee* v. *McKee*, 190 Iowa, 1357, 181 N. W. 672.)

It is clear also that to a certain extent the father reposed trust in the son. But in the light of the testimony, it cannot be maintained that in the beginning conditions between father and son were materially different from the relationship which exists between any man of large affairs and his secretary. At his father's request defendant collected the rentals from his father's property, deposited them to his father's credit, and paid his father's bills. Further than this defendant did not go prior to February 26, 1924. After that the father did not have any property save a life estate in the income from property he had conveyed. Under the statute (sec. 7882) it cannot be gainsaid that defendant was to a limited extent his father's trustee. As such he might not use the influence which his position gave to him (if it gave him any) to obtain any advantage over his father. (Sec. 7891, Rev. Codes 1921.)

"All transactions between a trustee and his beneficiaries during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence." (Sec. 7895, Id.) The question arises: Did defendant by virtue of any influence he acquired as trustee obtain any advantage from the beneficiary, his father? Did fiduciary relations exist?

The term "fiduciary relation" is a broad one not susceptible of exact definition. It may exist under variant circumstances. It is said to exist "when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." (21 C. J. 1119.) In Mr. Pomeroy's view every fiduciary relation implies a condition of superiority held by one of the parties over the other. (Pomeroy on Equity Jurisprudence, 4th ed., sec. 956.)

The foregoing questions will be answered by determining whether the defendant occupied a superior position, had acquired influence over his father, and made use of his position and influence to gain a personal advantage.

Without the presumption flowing from the assumed exercise of influence acquired by defendant as trustee and an advantage gained by him as a result thereof, or, in other words, the assumed existence of a fiduciary relationship between defendant and his father, the plaintiff would be completely out of court. The presumption, of course, is a disputable one. If the evidence which is introduced to prove a fiduciary relationship at the same time shows that the actions of the trustee were done in good faith and for the benefit of the *cestui que trust*, there is no room for a presumption of wrongdoing on the part of the trustee.

It will be recalled that the testimony came almost wholly from the defendant and his witnesses. We cannot say that between the fourth of September, 1923, and the twenty-sixth day of February, 1924, during which period the trust agreements,

the bill of sale and the indorsements upon the securities, the deed from the father to his son Walter, the deed from the father to his daughter Rose, and the power of attorney from the father to the defendant, were executed, the son occupied a superior position or sought to exercise any superior influence over his father; on the contrary, the old gentleman seems to have acted wholly in accordance with his own independent judgment. And what happened after the execution of the power of attorney, which is the last instrument with which we have to do, is not very material. But if it be conceded that a fiduciary relationship in its strict sense did exist between the father and son, and therefore the presumption obtained, we cannot say that it has not been fully overcome by the testimony. It would be a gross perversion to say that there is not substantial evidence to support every finding essential to sustain the decree. Under the well-known rule this court reviewing the decree of a trial court will not overturn the findings unless there is a decided preponderance of the evidence against them. Here the evidence, if believed by the trial court, fully sustains the essential findings. What was said in the recent opinion of this court, speaking through Mr. Justice Matthews, respecting the coign of vantage occupied by the trial judge in weighing the testimony of the witnesses, need not be repeated here. (*Hansen* v. *Johnson,* 90 Mont. 59, 4 Pac. (2d) 1088.)

We have read the transcript carefully, parts of it again and again, and have considered the various assignments of error with the aid of the exhaustive brief of counsel for appellant. But in view of the conclusion reached we think it will not serve any useful purpose to consider the case in further detail.

The judgment is affirmed.

Associate Justices Galen, Ford, Angstman and Matthews concur.