MARLIN, Respondent, v. DRURY, Appellant.
No. 9007.
Submitted December 8, 1950. Decided March 8, 1951.
228 Pac. (2d) 803.

Mr. Ralph J. Anderson, Mr. Albert C. Angstman, Helena, for appellant.

Messrs. Keeley and McElwain, Mr. John M. Dietrich, Jr., Deer Lodge, for respondent.

Mr. Anderson, Mr. Angstman, Mr. Joseph A. McElwain and Mr. Dietrich argued orally.

MR. CHIEF JUSTICE ADAIR:

This is an action by the plaintiff Lewis J. Marlin to recover money which he paid to the defendant R. P. Drury for an interest in a lease on certain placer mining property. The action is based solely on three alleged fraudulent representations charged to have been made in negotiating the deal.

The action was instituted November 18, 1949. The complaint charges that four months previous, to-wit, on or about July 18, 1949, the defendant Drury and one Peter M. Mosier exhibited to plaintiff certain gold nuggets and dust and fraudulently and falsely represented to plaintiff: (1) That the gold nuggets and dust so exhibited came from certain leased placer mining claims in Deer Lodge county; (2) that they were about to organize a corporation to work such placer ground, and (3) that such placer mining venture would return vast profits to plaintiff through stock dividends in the proposed or intended corporation.

The complaint further avers that, relying upon the aforesaid representations, plaintiff paid to the defendant Drury,

sums aggregating $1,000; that plaintiff received no consideration for the money so paid in the way of preincorporation subscription, receipt or any other evidence of payment except he has his cancelled checks showing the payments so made; that any property which defendant owns or leases for mining purposes is worthless; that defendant did not organize the corporation as he had promised; that all the alleged representations were made for the purpose of deceiving and fraudulently taking plaintiff's money; that plaintiff demanded the return of his money and that defendant refuses to pay back any part of it.

The answer of the defendant Drury admits: That he and Mosier exhibited gold nuggets and dust to plaintiff; that plaintiff made payments to defendant aggregating $1,000; that plaintiff received no receipts for such payments other than his cancelled checks; that no corporation has been organized for the working and mining of the placer property; that plaintiff demanded the sum of $1,000 from defendant and that defendant has refused to pay same or any part thereof. The answer denies all other allegations of the complaint and, for a separate affirmative defense, alleges the defendant Drury, having acquired a lease on the placer mining property, was in need of capital to work same; that Peter M. Mosier suggested that the plaintiff Marlin might be interested in buying in on the deal; that defendant and Mosier contacted plaintiff and defendant offered plaintiff a 1% interest in the lease for $1,000; that plaintiff accepted such offer and gave defendant a check for $750; that defendant agreed to and that he did hold such check until plaintiff had an opportunity to examine such mining property; that some two or three days later plaintiff personally examined the placer property in the absence of defendant and thereafter plaintiff stated his willingness to go in on the deal and then gave defendant a further check for $250, whereupon defendant cashed both checks; that it was agreed that thereafter the various persons contributing capital to such mining venture would get together and form a corporation, partnership or syndicate as the majority of such contributors should agree

upon; that no false or fraudulent representations of any kind were made to plaintiff and that he freely and voluntarily paid his money into such placer mining venture.

The plaintiff filed a reply placing in issue the new matter pleaded in the answer. Thereafter the issues were tried to a jury resulting in verdict and judgment for plaintiff from which judgment the defendant has appealed.

Defendant's motion for nonsuit made at the close of plaintiff's case in chief was denied as was defendant's motion for a directed verdict made at the close of all the evidence in the case.

There is no evidence whatever to sustain the charge that defendant falsely represented that the gold nuggets and dust exhibited to plaintiff came from the aforesaid placer mining property. Both the defendant Drury and the witness Peter Mosier testified that the gold so exhibited came from such leased placer mining property and their testimony stands uncontroverted and in his brief on this appeal the plaintiff Marlin admits "that the exhibition of the nuggets was not proven fraudulent" and states that he would not argue such contention.

There is likewise no evidence to sustain the charge that the leased placer mining property is worthless and again in his brief herein the defendant admits "that it was not proven that the property was valueless" and again did he state that he would not argue such contention here. The property was leased from William R. Allen, former Lieutenant Governor of Montana who testified that the ground was valuable for placer mining operations and that while the mining operations in the summer of 1949 were most limited, he had received therefrom as his 10% royalty under the lease the sum of $400.00.

The evidence shows: That the defendant Drury first tested the placer mining ground here involved for some 30 days with a "Long Tom" and a rocker and that by such means he had recovered considerable gold; that about July 18, 1949, and following such testing, he commenced placer mining operations on the property; that for such mining operations he purchased

one dragline and rented another; that he also obtained a washing plant to be operated in connection with the dragline; that in such placer mining he employed eight men,—four of whom worked on the draglines and four on the washing plant; that the dragline which he purchased was found to be defective and that he experienced continual breakdowns with the machine; that it could not be made to operate properly and efficiently; that upon the seller's refusal to make the machine work defendant declined to make further payments thereon and the seller thereupon repossessed it; that after he had acquired his lease defendant excavated about 5,000 yards of earth on the property about 50% of which was "overburden" or top soil; that because of the repeated breakdowns and the unsatisfactory condition of the machinery defendant was able to get in but about 10 days of actual operation with the draglines and washing plant that season, but that from such limited operations he recovered and sold about $3,800 worth of gold and that defendant's cost of operation ran about $4,800 so that the 1949 mining operations were conducted at a loss. However, it would appear that with proper machinery, equipment and operation the property would produce substantial profit and that defendant was justified in anticipating that a profit would result to him and to the others associated with him in the venture had it not been for the repeated machinery breakdowns and the expense and delays occasioned.

The evidence shows that Peter M. Mosier was a mining engineer and a mutual friend of both the plaintiff Marlin and the defendant Drury; that Mosier had no interest in the placer mining property nor in the lease thereon; that on different occasions both prior and subsequent to World War II and for a period of about three or more years the plaintiff Marlin had worked for Mosier in a mine at Radersburg, Montana; that such mine was closed by the government and that thereafter Mosier was employed by the defendant Drury on a salary basis examining, testing and checking various mining properties in western Montana. The evidence further shows that at the time

the plaintiff Marlin examined the placer property and invested in the venture he was then employed as a miner on other mining property located near and in the same county in which the leased holdings were situate.

At the trial the plaintiff Marlin testified on direct examination:

"Q. Did Mr. Drury make any statements to you concerning a corporation? A. He did. He said they were going to form a corporation as soon as possible. There is no corporation formed that I know of.

"Q. Were you to receive stock in that corporation?

"Mr. Anderson: Objected to, as leading, if the Court please. Let the witness testify as to what was said.

"Q. What else was said about the corporation? A. They were to form this corporation, and I was to get dividends. They said this thousand dollars would bring me more than my wages would bring me for working for the company would bring in."

On cross-examination Marlin testified:

"Q. Didn't he say to you at that time it would depend upon the people who had invested in it, whatever they wanted to do—you among them—as to whether they would have a corporation, syndicate, partnership, or common law trust? A. No; the only thing he ever mentioned to me was about forming this corporation is all I know.

"Q. He did tell you that, at that time, he didn't know whether the dividends would be paid that year, or next year? A. That year or next year.

"Q. That would be 1949, or 1950? A. Yes, sir. * * *

"Q. Mr. Marlin, do you know whether or not Mr. Drury still has a lease on these premises? A. No, I don't.

"Q. Did you ever ask him for an assignment of interest in it? A. No."

The defendant Drury testified:

"Q. Was anything said, further, in that conversation about, if he came in, what would be done with reference to the future organization? A. I told him, for $1,000.00 I would give him a

one per cent interest in the lease, and I would act as trustee until the property was in proper operation, where we could see where we was going, and we would all get together, every one that was interested, and decide what kind of an operation, an organization, corporation, partnership, syndicate; I would leave it to whoever put up the money.

"Q. There were other investors? A. Yes."

The record shows that in addition to the investments of the defendant Drury and of the plaintiff Marlin there were three other investors in the lease, each having a 1% interest for each $1,000 invested; that one Louie Lineweaver had $5,000 invested and that Olaf Larson and Ida Larson, his wife, jointly had $10,000 invested. These investors likewise had a right to be consulted and to say what kind of an organization they desired to operate the property.

The witness Mosier testified:

"Q. Was anything said at that time about the organization of a corporation? A. We talked there; and, as far as I know, as far as I can recall, Mr. Drury said he intended to form a corporation, or something; but he hadn't done it at the time. He intended to form some kind of organization after they had got going and the people had put in the money, they would get together and see what they wanted. * * *

"Q. Did Mr. Drury mention any other kind of an organization, other than a corporation, at that time? A. Yes; syndicate, or a partnership, or something; they just mentioned it could be anything."

The placer mining property here involved was located at an altitude of 7,200 feet and because of early freezes and the employees complaining of the cold in the fore part of September, defendant decided to call off further mining operations for that season and to move the dragline off the property. Thereupon plaintiff came to defendant and asked for a return of his money, and upon defendant's refusal to comply with his demand he instituted this action.

Defendant testified that during the time he was struggling

with the inefficient draglines and washing plant in his efforts to develop and prove the value of the property he had no money to pay for the organization of a corporation nor does it appear that the organization of a corporation would have either lessened defendant's troubles or added to the profits of the venture.

Plaintiff stresses the fact that he was given no stock, or receipt or other writing to show his interest in the mining lease. As to this feature of the case the defendant Drury testified:

"Q. You never gave Mr. Marlin any receipt for a thousand dollars? A. I asked him at the time he gave me the check, I said, 'I'll give you a receipt if you want, or whatever you want to do.' I explained to him that, when we got the thing in operation, we would call the thing together and we would have whatever kind of operation they wanted; and he said, 'Let it go at that.'"

At the trial defendant also testified that the lease is still in full force and effect; that he recognizes plaintiff's interest therein; that plaintiff had never asked for a statement in writing showing his interest and that should plaintiff so desire defendant stood ready and willing to give him a written declaration showing that plaintiff owns such 1% interest.

Defendant's indefinite promise that "they were going to form a corporation as soon as possible," without setting any time or date for so doing as was testified to by plaintiff, is wholly insufficient to establish that in making such alleged promise the defendant had no intention of forming a corporation. The undisputed evidence shows that defendant did experience much trouble with the machinery and equipment between July 18, 1949, and September 5, 1949, and that he lacked necessary funds to enable him to then form a corporation. Nor can it be said that by the latter date an unreasonable time had elapsed for the formation by the investors of a corporation or other organization.

"The promise to incorporate * * is contractual in its nature and does not constitute fraud." Dobson v. Whitker, 242

Mich. 308, 218 N. W. 770, 772. See also Hilliker v. Jewell Oil & Gas Co., 277 Mich. 96; 268 N. W. 825. "The mere making of a promise which the promisor fails to keep does not constitute actionable fraud." International Harvester Co. v. Merry, 60 Mont. 498, 199 Pac. 704, 706.

In Cuckovich v. Buckovich, 82 Mont. 1, 264 Pac. 930, 933, this court in construing the statute, now R. C. M. 1947, section 13-308, subdivision 4, said: "If a promise be made in good faith there is no fraud, though the promisor subsequently changes his mind". In the case at bar there is no evidence that defendant's promise to organize a corporation, partnership or syndicate was not made in good faith or that he subsequently changed his mind. See Howe v. Messimer, 84 Mont. 304, 314, 275 Pac. 281.

"The expression of an *intention* to do a thing is not a *promise* ▉ to do it. An intention is but the purpose a man forms in his own mind; a promise is an express undertaking or agreement to carry the purpose into effect." Stewart v. Reckless, 24 N. J. L. 427, quoted with approval in Russell v. Sunburst Refining Co., 83 Mont. 452, 475, 272 Pac. 998, 1008.

"A statement merely as to what the party making it intends ▉ to do is not a misrepresentation, since it is not an affirmation of the fact, but is only an assertion that a present mental condition or opinion exists in him." Emerson-Brantingham Implement Co. v. Anderson, 58 Mont. 617, 627, 194 Pac. 160, 164. The foregoing are in harmony with the great weight of authority. See 3 Pomeroy's Equity Jurisprudence (5th Ed.), sec. 877c, p. 434, and 23 Am. Jur., Fraud and Deceit, secs. 35-38, pp. 794-799.

There being a failure of proof to establish either the false representations or fraud charged in the complaint defendant's motion for a directed verdict should have been granted. Accordingly the judgment is reversed and the cause remanded with directions to enter a judgment of dismissal.

MR. JUSTICES METCALF, BOTTOMLY, FREEBOURN, and ANGSTMAN concur.

Rehearing denied March 30, 1951.