JAMES RILEY AND JEAN RILEY, HUSBAND AND WIFE, PLAINTIFFS AND APPELLANTS, *v.* PATRICK BYRNE AND ROBERTA BYRNE, HUSBAND AND WIFE, DEFENDANTS AND RESPONDENTS.

No. 10838
Submitted October 15, 1964. Decided March 11, 1965.
399 P.2d 980.

John J. McCarthy (argued), Butte, for appellants.

Corette, Smith & Dean, Butte, Kendrick Smith (argued), Butte, for respondents.

MR. JUSTICE DOYLE delivered the Opinion of the Court.

This is an appeal from a judgment of the district court of the second judicial district, Silver Bow County, denying the appellant's petition to set aside a decree of adoption.

The record indicates that James and Jean Riley, plaintiffs and appellants herein, were intermarried in December, 1955, and that two children were born of that marriage. Both children are still in their minority. James Riley, the father of these children, and Roberta Byrne, one of the adoptive parents and a respondent herein, are brother and sister, being themselves adopted children of Mr. and Mrs. Frank J. Riley, hereinafter called the elder Rileys.

On July 10, 1963, in a separate proceeding before Judge Downey in the district court of Silver Bow County a decree of adoption was entered whereby the respondents, Patrick and Roberta Byrne, were granted the care, custody and control of the Riley's two minor children. Subsequently, on March 19, 1964, the appellants commenced this proceeding below to set aside that decree. In the original petition the sole ground

alleged for setting aside the decree of adoption was that "the alleged consent of the plaintiffs herein was secured by fraud; that said consent was not given freely; [and] that said consent was not the voluntary act of the plaintiffs herein."

To this petition and the show cause order issued thereon the respondents answered by denying the allegation of fraud and by affirmatively pleading that the welfare and best interests of the children required that the decree be not set aside; that the consents were irrevocable, and, that, as to the plaintiffs, the decree was res judicata, and any further action on their part was barred by laches. The defendants prayed for a hearing on the merits and vacation of the show cause order; accordingly, the cause went to trial before Judge McClernan, sitting without a jury.

In support of the allegation that their consents to the adoption had been procured by fraud plaintiffs testified that the respondents, and the elder Rileys, had accused James Riley of mail theft, that they had evidence of such crime and that if the appellants did not sign the consents to adoption such evidence would be turned over to the authorities. In addition, appellants also testified that the respondents and the elder Rileys had told them that they had some "stuff" evidencing the fact that the children were being neglected; that if the consents were not signed such evidence would be given to the welfare department, and their children would be taken from them.

Appellants also stated that the respondents had told them, and they understood, that the adoption was only temporary; that the respondents would keep the children until they, the appellants, "got straightened around". On cross-examination, however, both parents admitted that, immediately before they had signed the consents, the respondents had told them that there were "no terms". Cross-examination also revealed that both the parents had read the consents and that they understood the effect to be given them.

With respect to the issue of coercion, the respondents and the elder Rileys unequivocally denied that they had accused the appellant James Riley of the commission of any crime, or that they had threatened to go to the authorities with evidence of any crime. Respondents, however, did admit that they had acquired evidence relating to the condition of the appellants' home and the treatment of the children, and that such evidence would be taken to the welfare department if the consents were not signed.

Despite the absence of any allegations in their pleading, appellants further testified that the consents were deficient and not executed pursuant to statute in that the acknowledgements were not made "before an officer authorized to take acknowledgements."

The testimony of the respondents, for the most part uncontradicted, related to the appellants' home and the living conditions of the children, depicting a scene which could only be characterized as squalid, sordid and totally unfit as an environment for little children. The house, which was owned by the elder Riley and which was located adjacent to his motel business, was described as being "filthy", with grease-stained walls and windows, broken plaster, and peeling paint which hung in strips from the ceiling and walls of the bathroom. The respondents and the elder Rileys all testified that the house was littered with tools, spare parts and other mechanical paraphernalia, that "girlie" magazines and contraceptives were in evidence everywhere, on the desk, on the floors of the bedroom and clothes closet, and on the front seat of the appellants' family automobile. Mr. Riley testified that his son was engaged in the salvage business; that at one time there were as many as thirty-five junk cars, in various stages of disrepair, standing about the premises. The testimony revealed that at one time it was necessary to climb over some of these cars to gain access to the front door of the appellants' house. Mr. Riley testified that he had repeatedly urged his son to clean

up and repair the house to make it more tenantable, and that he would supply the necessary paint and materials. These offers were consistently refused or went unheeded.

As regards the type of care given these children by their parents, the record indicates that despite the continuing efforts of the respondents and the elder Rileys, the children were generally unkempt, poorly clothed and rarely bathed. Respondents' witnesses told of innumerable instances in which the two infants had appeared at the respondents' home in need of a bath, a change of clothing, and other personal attention; that when the children were given these baths and otherwise administered to, their physical condition had indicated general neglect and improper care. Roberta Byrne is also a registered nurse. She testified that, in one instance, the boy came to her home; he appeared to be ill. She took his temperature, found that it was 103 degrees. She kept the child in bed in her home for a period of about three days, giving him medication and otherwise caring for him. During this period neither of the appellants called or came to inquire about the well-being of the boy.

The record also reveals that just prior to the date that the appellants signed the consents, Patrick Byrne, one of the adoptive parents, told the appellant Jean Riley that they, the respondents, were taking the children for a while and that she should go visit her mother in Deer Lodge. The appellant went to Deer Lodge and stayed for about a week, during which time she never protested that the children were being kept from her, nor did she telephone or otherwise inquire about the welfare of the children during that period.

It was during this time, immediately before the consents were signed and Jean Riley went to Deer Lodge, that James Riley was engaged in a two-week tour of duty with the Army Reserve. Upon his return, the appellant testified that he went to his parents' home; that the respondents told him they had consents drawn up and that they wanted him to sign them.

He refused. The appellant then left and drove to Deer Lodge to discuss the situation with his wife. The following day, Sunday, both appellants returned to Butte. They again had a "conference" with the respondents and the elder Rileys. The appellants again refused to sign the consents and left. They drove around the remainder of that day and that night. On Monday morning between 9:00 and 10:00 a.m. they returned to the Riley residence. The appellants then asked about the "terms." The respondents said that there were no terms, that they had the evidence to take to the welfare department and would do so immediately if the consents were not signed. Thereupon, the appellants signed the consents for adoption in the presence of the respondents and the elder Mrs. Riley.

With respect to the validity of these consents to adoption, from the record it appears that H. D. Carmichael was the attorney in the original adoption proceedings. He testified that James Riley had informed him over the telephone that he would sign the consent. He further testified that he had instructed the respondents to inform him when the appellants came to sign the consents; that he had received such a call on Monday morning, and that just as he was arriving at the Riley home, the appellants were leaving. On the basis of these consents, and the respondents' petition, the district court, on March 10, 1963, made and entered its final order of adoption.

The record further reveals that subsequent to the adoption decree the appellant Jean Riley instituted proceedings for writ of habeas corpus. This was introduced, presumably, to evidence the fact that appellants had made a continuing effort to regain custody of their children. However, on cross-examination, counsel for the respondents brought out the fact that shortly after the petition was filed it was abandoned and dismissed voluntarily.

After submission of all the evidence the court determined all material issues of fact in favor of the respondents. Upon these facts the court concluded that the decree of adoption

was in all respects legal and proper; that the consents in the adoption were voluntarily given and not brought about by fraud; that the welfare and best interests of the children would be furthered by affirmance of the adoption decree; that the consent of the natural parents was irrevocable; and that the matter had become res judicata, and plaintiffs were barred by laches.

The questions determinative of this appeal are whether appellants' consents were obtained voluntarily.

Initially, we observe that the rule in Montana is that the question of fraud is one for the trier of facts. (Clifford v. Great Falls Gas Co., 68 Mont. 300, 308, 216 P. 1114.) We also observe in this connection that the burden of proving fraud falls upon the party asserting it and that proof thereof must be made by satisfactory evidence. (Teisinger v. Hardy, 86 Mont. 180, 282 P. 1050; Hjermstad v. Barkuloo, 128 Mont. 88, 270 P.2d 1112.) In view of the contradictory testimony relative to the alleged threats of criminal prosecution, we think, as did the court below, that the appellants' evidence of these threats was something less than satisfactory. Neither, we believe, do the respondents' statements that they were going to go to the welfare authorities constitute misrepresentation, threats, or a coercive influence sufficient to defeat the voluntary character of the consents. In Emerson-Brantingham Implement Co. v. Anderson, 58 Mont. 617, 627, 194 P. 160, 164, this court stated that a "statement merely as to what the party making it intends to do is not a misrepresentation, since it is not an affirmation of the fact, but is only an assertion that a present mental condition or opinion exists in him." (See, too, Marlin v. Drury, 124 Mont. 576, 584, 228 P.2d 803; 23 Am.Jur., Fraud, § 35 et seq.; 37 C.J.S. Fraud § 6; In re Adoption of Hiatt, 69 Wyo. 373, 242 P.2d 214; Smith v. Dear, 143 Mont. 330, 390 P.2d 209.) Accordingly, we hold that the appellants' consents to the adoption were voluntarily given and that the lower court did not err in so finding.

We also agree with the conclusion arrived at by the lower court that the adoption was valid and legal.

In the case before us, the consents of the natural parents were obtained without observing the necessity of acknowledgement. Thereafter, these natural parents instituted judicial proceedings which afforded them a full hearing upon all issues bearing upon the voluntariness of their consents and the adoption proceedings generally. To deny the validity of a decree of adoption for lack of acknowledgment when the natural parents have fully exercised those rights which such acknowledgment was designed to protect would, we think, reach a result contrary to the spirit of our adoption statutes. This result is in harmony with decisions of other courts which have considered similar questions.

The record in this respect more than amply sustains the findings and judgment of the district court. Accordingly, we hold that the consents of the appellants to the adoption was voluntary and valid, and that the lower court did not err in finding that the adoption was for the welfare and best interests of the two minor children.

These conclusions obviate the necessity of determining the applicability of the doctrine of res judicata to the adoption decree in the instant case or, the question of appellants' laches.

Judgment affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES CASTLES, ADAIR and JOHN CONWAY HARRISON concur.