TOM GOGGANS AND PHOEBE GOGGANS, HUSBAND AND WIFE, PLAINTIFFS AND APPELLANTS, *v.* CLARENCE H. WINKLEY, ET AL., DEFENDANTS AND RESPONDENTS.

No. 11694.
Submitted January 20, 1970.
Decided February 18, 1970.
Rehearing Denied March 12, 1970.
465 P.2d 326.

452

William A. Douglas (argued) and Leonard L. Kaufman (argued), Libby, for plaintiffs-appellants.

L. Lloyd Evans (argued), Libby, for defendants-respondents.

MR. JUSTICE HASWELL delivered the Opinion of the Court.

Action for damages by purchasers of land against sellers and real estate agent based on alleged false representations of the latter inducing purchasers to buy. The district court of Lincoln county directed a verdict for defendants and entered judgment of dismissal. From the district court's denial of purchasers' motion for new trial, purchasers appeal.

Plaintiffs herein are Tom and Phoebe Goggans who purchased from defendants, Clarence H. and Dorothy I. Winkley, a two acre tract of land with frontage on the Libby-Jennings highway in Lincoln County, Montana. The purchase was made about March 1, 1967, through the other defendant, M. M. Mansfield, a real estate agent in Libby who handled the sale for the Winkleys. Plaintiff-purchasers made an earnest money payment and signed a written purchase offer on a form prepared by the real estate agent which contained the following provisions:

"All representations made by Broker or its agents to Buyer concerning said real or personal property are believed by it and them to be true and correct and are made in good faith but neither Broker nor any of its salesmen or agents represents or warrants any thereof to be true. Buyer has personally inspected said premises and personal property and is personally familiar with the location, size, and condition thereof and is relying solely upon Buyer's own information about and investigation of the same and also as to any financing of this sale contemplated by Buyer."

The sale was completed by a written contract for deed signed by plaintiff-purchasers and defendant-sellers which contained the following provision:

"It is agreed and understood between the parties hereto that the expense of surveying the premises herein described shall be borne by second parties."

Plaintiff-purchasers entered into possession and made certain improvements on the property, generally consisting of a gas station, store, and trailer park. Thereafter plaintiff-purchasers were informed by agents of the Montana highway department that their property encroached upon the highway right-of-way approximately 40 feet. This action followed.

According to plaintiff-purchasers, the real estate agent made false representations which induced them to enter into the contract for deed under which they purchased the property. These generally consisted of statements to the effect that certain stakes on the property marked its boundaries, that such survey was accurate and the stakes marked the true boundaries, and that any additional survey by the purchasers would be a waste of time and money. According to plaintiff-purchasers, they relied on these statements, obtained a drawing of the property from the real estate agent with dimensions of the property marked thereon, went to the property and measured the distances between the stakes which checked with the dimensions on the drawing, and accordingly did not have a survey made.

Plaintiff Tom Goggans testified at length concerning the representations made to him by the real estate agent. His wife did likewise. During the course of plaintiffs' case-in-chief the contract for deed signed by the purchasers and sellers was introduced in evidence whereupon defendants moved that:

"* * * all evidence concerning oral representations made by [the real estate agent] be stricken from the record and that no further evidence be admitted in the course of this trial concerning any such misrepresentations; the written agreement comprising the entire agreement between the parties".

No ruling was immediately made on this motion by the court although argument was heard thereon outside the presence of

454

the jury. In chambers plaintiffs then submitted the following offer of proof:

"MR. DOUGLAS: Comes now the plaintiffs and submit the following offer of proof:

"That by the sworn testimony of Phoebe Goggans and by the sworn testimony of Tom Goggans, they will testify that when they contacted the defendant, Mr. Mansfield, they considered him a representative broker and that he had full knowledge of the general business of real estate and more particularly specific knowledge as to the property that they were interested in purchasing; that on several occasions prior to the execution of the contract dated March 1st, Mr. Mansfield advised them that he knew all the facts concerning this property; that the property had been surveyed by a competent surveyor, that the boundaries were properly staked and that said stakes represented the true boundaries of the property; that any additional survey would have to be at their own expense but that it was a waste of time; that in reliance upon such statements the defendants signed the contract dated March 1st and on the reliance of the representations by Mr. Mansfield considered the provision as to expenses of survey applied only to additional surveys; that by virtue of the representations and the reliance thereon, the plaintiffs were damaged in the following amounts: Work, labor and material in the development of the property for a store, trailer park and service station in the amount of $11,550.35; In addition thereto, the plaintiff, Tom Goggans, would tstify that he expended his own work and labor for a period of a year with more than 40 hours per week for each week in the development of the trailer park, the construction of the store building and other work directly related thereto; that the present value of the property by virtue of the encroachment on State Highway land is nil; that the defendant Phoebe Goggans, devoted at least 10 hours a week for a period of a year on the development of the trailer park and store; that a reasonable value of the services of Phoebe Goggans was the sum of $1,200.00; that a reasonable value for

the labor of Tom Goggans was $7,500.00; that in addition thereto, the plaintiffs purchased a 1962 Detroiter Mobile Home, Serial No. F.B. 54-2F-10S of a reasonable value of $5,000.00; that the trailer was made a permanent part of the store building; that by the testimony of the said Tom Goggans, the boundaries as established by the stakes was incorrect; that in support thereof the plaintiffs would have called Vern Borden, an Engineer with the Montana State Highway Department, who, by reason of his employment, experience and training, is familiar with surveying and all matters relating thereto, and that the Montana Highway right-of-way encroaches upon this property and did encroach upon same as staked by persons unknown 42 feet across the front of said property; that by the testimony of Bud Steele, a duly qualified, experienced appraiser of property both commercial and agricultural; that the present value of said property as a trailer park and store is nil. At the outset and at all times thereafter for the purchase of this property the Goggans were interested in purchasing the property and the development thereof for a trailer park and store and gas station; that they advised Mr. Mansfield of their plans for the development of said property and that he was well aware of same at all times; that had the plaintiffs known of the true boundaries of said property they would not have been interested in purchasing the property at any price and that the purchase of said property was made solely upon the reliance of the fraudulent statements of Mr. Mansfield as more particularly stated in this offer of proof.''

Defendants objected to such offer of proof and the court denied the offer in the following language:

''THE COURT: The Court denies plaintiffs' offer of proof for the following reasons:

''That the allaged misrepresentations made by Mr. Mansfield as a broker did not constitute fraud in view of the provisions of the contract dated March 1st and more particularly the provision on page 2 of Defendants' Exhibit B which reads as fol-

lows: 'It is agreed and understood between the parties hereto that the expense of surveying the premises herein described shall be borne by second parties', and for the further reason that such testimony is not of such a nature as to be an exception to the Parole (sic) Evidence Rule relative to written contracts. The Court makes this ruling based upon the files, pleadings and exhibits submitted as well as the offer of proof denied.''

Plaintiffs then made a second offer of proof that the same representations were also made between the time of the written offer to purchase and execution of the contract for deed. The court denied this offer of proof on the same basis that the previous offer was denied.

Thereupon the trial reconvened in the courtroom in the presence of the jury. Plaintiffs rested their case-in-chief. Defendants moved for a directed verdict in their favor which the court granted, thereafter entering judgment of dismissal of plaintiffs' action.

Subsequently plaintiffs moved for a new trial which the district court denied. This appeal followed. We note that the notice of appeal herein indicates that the appeal is from the order denying the motion for new trial. However, all parties in their briefs and oral argument have treated this as an appeal from the final judgment and we shall so treat it.

The basic underlying issue upon this appeal is whether the district court properly directed a verdict for defendants. If it did, plaintiffs' motion for new trial was properly denied; otherwise it should have been granted.

Initially we note that without the evidence encompassed in plaintiffs' offer of proof, there is a failure of proof of some of the material elements of plaintiffs' claim and a directed verdict for defendants is proper. Thus our inquiry here is reduced to a determination of whether plaintiffs' offer of proof was properly denied.

The district court denied plaintiffs' offer of proof on two grounds: (1) the alleged misrepresentations did not constitute

fraud because the contract required the purchasers to bear the expense of surveying the premises, and (2) the alleged oral misrepresentations are barred by the parol evidence rule.

"Whether or not there has been fraud in any given case is generally a question of fact. It is often said to be pecularily a question for the jury, in cases in which a jury trial may be had, and that it should be submitted to them if there is substantial evidence to support a finding of its existence." Russell v. Russell, 153 Mont. 461, 452 P.2d 77. Citing Healy v. Ginoff, 69 Mont. 116, 220 P. 539 (1923); Riley v. Byrne, 145 Mont. 138, 399 P.2d 980 (1965).

In the instant case we are dealing with an action of fraud or no fraud at all. By statute, actual fraud

"* * * consists in any of the following acts, committed by a party to the contract, or with his connivance with intent to deceive another party thereto, or to induce him to enter into the contract:

* * * * * * * * * *

"2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true * *". Section 13-308, R.C.M.1947.

Where, as here, plaintiff must make out a prima facie case of actual fraud, the material elements thereof have heretofore been held by this Court to consist of the following: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity, or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury. Helena Adjustment Co. v. Claflin, 75 Mont. 317, 243 P. 1063; Young v. Handrow, 151 Mont. 310, 315, 443 P.2d 9.

In the instant case the district court held, in effect, that plaintiffs had no right to rely on any representations of the real

458

estate agent because the contract for deed, signed by purchasers and sellers, provided

"It is agreed and understood between the parties hereto that the expense of surveying the premises herein described shall be borne by [purchasers]."

Purchasers' argue, and their offer of proof includes, that by reason of the representations of the real estate agent that he knew all the facts concerning the property, that it had been surveyed by a competent surveyor, that the boundaries were properly staked and said stakes represented the true boundaries of the property, and that any additional survey would have to be made at their own expense but that it was a waste of time; they considered the provision as to expenses of survey to apply only to additional surveys. Purchasers contend they were thus induced not to survey. Purchasers interpret the survey provision in the contract to mean that if any future survey is to be made, it shall be made at purchasers' expense without placing any duty upon purchasers to make any survey in the first instance.

Sellers, on the other hand, contend that the purchasers knew they were buying unsurveyed property, that Mrs. Goggans testified they were buying the property "as is", and therefore the survey provision in the contract was known and understood by the purchasers to mean that they must survey the property at their own expense to ascertain the true boundaries thereof.

We hold that, in any event, the survey provision in the contract does not bar inquiry into the question of whether purchasers got what they bargained for. If certain representations were made to purchasers by the sellers' agent relative to a previous survey, the marking of the boundaries thereof with stakes, and the measurements of the perimeter of the property and that these representations were properly relied upon thereby inducing purchasers to buy without a survey, all as comprehended in purchasers' offer of proof, and it later turns out that the representations are incorrect and the property is in

fact in a different location and encroaches on the state's right-of-way, then the purchasers are not foreclosed from attempting to prove these facts by the contract provision in question. The district court was in error at this point.

The second ground assigned by the district court for denying purchasers' offer of proof is that the proffered oral testimony is barred by the parol evidence rule. This rule is set out in statutory form in Montana as section 93-401-13, R.C.M.1947, and basically provides that as between the parties to a written contract, no evidence of the terms of the contract other than the contents of the written contract itself are admissible in evidence. This general statutory principle is subject to numerous exceptions, the one with which we are concerned in the instant case being set forth in the statute itself:

"'* * * But this section does not exclude other evidence of the circumstances under which the agreement was made * * * or to establish * * * fraud * * *'".

Here purchasers have alleged and offered to prove fraud in the form of false representations which induced them to enter into the contract in the first place. Fraud in the inducement has always been held to be provable by parol, notwithstanding the parol evidence rule. Advance-Rumely Thresher Co., Inc., v. Wenholz, 80 Mont. 82, 258 P. 1085; Sathre v. Rolfe, 31 Mont. 85, 77 P. 431.

Sellers argue that testimony of the alleged oral representations of the real estate agent are inadmissible because they varied the terms of the written contract. They argue that here the subject of the alleged false representation was an integral part of the written contract and fully covered by the writing, citing in support: Biering v. Ringling, 78 Mont. 145, 252 P. 872; Armington v. Stelle, 27 Mont. 13, 69 P. 115; Kelly v. Ellis, 39 Mont. 597, 104 P. 873. Suffice it to say that although these cases stand for the proposition cited, they are inapplicable in the instant case. Here, the alleged false representations related to the boundaries of the property as staked on the ground which

allegedly induced purchasers to enter into the written contract of purchase. The writing in this contract did not require purchasers to make a survey to ascertain the boundaries as a matter of law, as we have heretofore held.

Nothing herein contained is to be taken as any expression by this Court of the ultimate merits of this controversy, our decision herein being limited to the district court's directing a verdict.

The judgment of the district court is vacated and the cause remanded to it for a new trial.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN C. HARRISON and JOHN W. BONNER, concur.

MR. JUSTICE CASTLES (dissenting).

I dissent.

Here the purchasers, in writing, agreed:

"Buyer has personally inspected said premises and personal property and is personally familiar with the location, size, and condition thereof and is relying solely upon Buyer's own information about and investigation of the same * * *."

The purchasers also agreed, in writing, to bear their own surveying expense.

Rather than having a survey made, of land they knew to be unsurveyed, the purchasers, armed with a diagram or map of the two-acre tract which fronted on a highway, went forth and with their own tape measured out what they *assumed* to be the tract. They assumed this from having found wood stakes with blue or red tops.

The purchasers had just previously to this purchase, been involved in another purchase of a tract of land about ¼ mile away next to the same highway. In that instance plaintiff Tom Goggans testified that he bought the tract "* * * with them showing me the lines and promising the survey the fol-

lowing spring." It too had a stake with a ribbon on it in the center of the highway. It developed that a loss of a 20 foot by 200 foot strip occurred because a later survey showed the assumptions of the purchasers in error.

With this previous experience fresh on his mind, purchaser went to see Mansfield, the realtor. The price was $6,000. The purchaser brought his wife along to see the property and concerning this he testified:

"Q. And would you describe what you did? A. Well, we parked in a little drive in just immediately above the property that we are talking about and so I sat there for a minute or two and discussed it and looked over the flagging and where it had been brushed over. It hadn't been dozed off but all the timber and the brush and stuff had been took off of there and we seen two or three stakes. I mean, we didn't get out and really inspect it close, but I walked up and down on the front end of the road from one end to the other and my wife walked a little ways with me up to the first corner and she stayed there and I walked up on the road and come back. We debated approximately how much it would cost to move enough of this mountain back into this hole there to erect a store building and then still have a few trailer pads in the back too.

"Q. Now, how much—was there any snow on the ground at this time, Mr. Goggans? A. Yes, there was some.

"Q. Was the ground completely covered with snow? A. No. The ground was—in fact in a few places it was bare.

"Q. At this time you spoke of some stakes. Would you relate to the Court which stakes you saw at this time? A. Well, the first stake that I come to was the one that I first seen on the trip that my wife and I was there which I assumed was the corner stake just off the highway.

"Q. Did you see any other stakes, Mr. Goggans? A. Yes, At that time I just casually looked up the hill from this front stake where I was standing and I looked up and looked down

the other way and there was two or three lath like stakes. They was kind of a thin stake, about an inch wide.

"Q. And you saw stakes both ways that you looked? A. Well, I wasn't paying too much attention at the time to the stakes. I noticed the stakes and the ribbon and things around, but I was more interested in figuring out the price and everything on the place at that time.

"Q. And now, did your wife make a thorough investigation at this time or did she just stand on the highway? A. No, she just stood on the highway.

"Q. Did you go on to the property in the vicinity of the stakes or did you also stay on the highway? A. Well, I stayed on the highway too, although I walked down to this corner stake that was immediately off of the highway.

"Q. Well, then, after you got done looking at the property, what did you then do? A. Well, my wife and I got back in the car. In fact, I think my wife got in ahead of me, I don't know, but we got back in the car and sat there for a few minutes and discussed it and talked about the possibilities and whether we was going to have enough money to go ahead and develop the place on out.

"Q. And did you then return to Libby? A. Yes.

"Q. Did you go to Mr. Mansfield's office? A. Yes, we did.

"Q. And did you see Mr. Mansfield? A. Yes.

"Q. What was the discussion that took place at that time? A. Well, my first approach was in regard to the price. I asked him if $6,000.00 was the least that the place could be bought for and he said he thought so, and then he wanted to know what my offer would be and I said 'well, I would give $5,000.00 and take it' and he said—well, he informed me that he would have to do some checking on it and see, and in the meantime, why we was talking about the staking of the property and if it would be a good deed and title delivered on it.

"Q. And what did Mr. Mansfield say with regard to these stakes? A. Well, he said 'I am pretty sure that it has been sur-

veyed and that it was all okay but he would check.' He wanted some time to check on it and see.

"Q. Did he tell you that there were stakes out there? A. Yes.

"Q. Did you pay any earnest money down at this time? A. Yes. Through that conversation there why we gave him $200.00 earnest money.

"Q. And what was Mr. Mansfield suppose to do then? A. Well he was supposed to check to see if he could get it for $5,-000.00 and find out about the delivery of the title and all, if it was all okay and the survey and see if everything was okay.

"Q. And then that was the end of your conversation basically with Mr. Mansfield? A. Yes.

* * * * * * * * * *

"Q. And what was the discussion at that time? A. Well, we came back to find out if he had gotten all the information that he was supposed to get and if we could get the property for $5,000.00.

"Q. And what did he say? A. Well, he informed us that the least he could get it for was $5,200.00.

"Q. Did he come up with any plat or anything like this relative to the things that he said he was going to do with regard to the boundaries of the property? A. Yes. That was one of the things that he would check at the courthouse and apparently from the way that he talked, that is where he got this plat that he brought.

"Q. And what was this that he gave you? A. It was the map drawed with the dimensions and things of this property up there.

"Q. How big was this? Was it as big as the sheet that I am holding in my hand? A. It wasn't quite that big of a sheet of paper.

"Q. It wasn't as big as this legal length? A. I would say it was as long as this is wide and about half as wide.

"Q. Did this drawing have any surveyor's name or anything like this on it? A. No.

"O. Was it drawn in ink or pencil? A. Well, it was heavy lines.

"Q. You don't know whether it was drawn in ink or pencil? A. No.

"Q. Bascially what was it? What did it have on it? A. Well, it was a map and I was assured that it was a map of that property that I was buying.

"Q. Did it show the boundaries of your property, of the property you are talking about? Did it show the boundaries? A. Well, I am not sure now just how you mean that.

"Q. Well, was it the shape of your property? A. Well, it's 400 feet long and 200 feet wide on one end and 233 and some tenths on the other end.

"Q. And how wide in the back? A. 400 feet.

"Q. And did this thing that Mr. Mansfield gave you, this drawing, show this property? A. Just exactly?

"Q. Did it give dimensions for each side on that property? A. Yes, it did.

"Q. What did you and your wife do after Mr. Mansfield gave you this drawing? A. Well, I had a 100 foot tape in the car and so we—I told Mr. Mansfield I would go back and we would check it all out and we would be back in a little while and let him know for sure what we was going to do.

"Q. And did you and your wife, Phoebe, go up to this property- A. Yes, we did.

"Q. And what did you do when you got there? A. Well, we pulled into the same place that we had previously went in the first time and got out and we started at this first stake right there by the Forest Service's land and then went down the highway back towards Libby here.

"Q. You mean you measured it? A. 400 feet, yes.

"Q. And did you measure the other three sides of the property? A. Yes.

"Q. And what did the measurements show relative to the dimensions indicated on this drawing? A. 400 foot on the front,

200 foot up the downriver end, 400 foot across the back and 233 feet and some tenths. It was just almost right on 33 feet.

"Q. Did these measurements coincide with what was indicated as the distance of the sides in this plan of map that was given you? A. Yes. It was exactly what I was told and what was on the map.

"Q. Did you and your wife then return to Mr. Mansfield's office? A. Yes.

"Q. What was the discussion that took place at that time then? A. Well, we approached him again on who the engineer was that surveyed it off and he thought Mr. Ninneman was. I said 'well, if Jack Ninneman surveyed it it's good enough for me,' but he wasn't sure.

"Q. Did you ask him whether or not these stakes were good? A. Yes. He stressed the fact that it was good.

"Q. And did he say that you could rely upon this fact? A. He definitely did.

"Q. Did you tell him about the fact that you and Phoebe had measured these stakes? A. Yes.

"Q. And did you tell him about the results? A. Yes.

"Q. Did you—was there any discussion between you and Mr. Mansfield about a possible subsequent survey on the premises? A. Just exactly what do you mean by subsequent?

"Q. Did he say anything about who would pay for a subsequent survey on the premises? A. N. They said they had already paid out all that they was going to pay on the survey but at any time in the future that I wanted a different survey it would have to be at my own expense.

"Q. Did he indicate to you the advisability of running a later survey? A. No. He indicated to me it wasn't necessary at all.

"Q. Did he indicate whether you would be wasting your money or not? A. Yes he did. In fact that was one of the words that he used that it would be wasted money if I got a further survey on it.

\* \* \* \* \* \* \* \* \* \*

"Q. And what were the corner stakes on the back? A. The one corner on the left corner—I am not positive whether it was a 2 by 2 or a 1 by 2. It possibly could have been a 1 by 2, and the other stake on the upriver back corner is another kind of an odd looking stake. I mean, you just don't see it very often.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

"Q. Now, during these times that you went out to the property, Mr. Goggans, did Mr. Mansfield ever accompany you? A. No.

"Q. Is there any reason why he didn't go out with you? Did he tell you any reason why he didn't go out with you? A. No, he didn't. It seemed like to me—I am not sure but it seemed to me like he would go with me but he had somebody to meet or something and seeing that I knew where the stakes and everything was and both of us knew where the property was that I was buying, why—well, I don't know actually why the reason he never did go but he definitely never did go with me."

The foregoing is the total story. Purchaser, Tom Goggans, testified that he *assumed* a stake to be a corner stake. Interestingly, here the purchaser Goggans left the witness stand with his counsel stating that he was missing a very important letter he wanted to introduce. The court stated: "It's understood that the direct examination is not closed until Mr. Goggans is through. Mr. Goggans, is he through?" Counsel for Goggans responded: "Yes, at this time, your Honor, I am through with him."

Goggans was never recalled to the stand to complete his direct examination. His counsel, after the court denied the offer of proof recited in the majority opinion, stated: "At this time, your Honor, then plaintiffs advise the Court that they rest their case."

The defendants had not even cross-examined! Notice, too, that at no time did Mansfield or anyone else point out or indi-

cate the corners or boundaries to Goggans. Goggans assumed some "odd looking stake" to be a corner.

With this condition of the evidence, the plaintiffs having rested their case, the court was correct in granting a directed verdict.

First of all, it is elementary that the right to cross-examination was effectively foreclosed by the unusual tactics of plaintiffs' counsel. Thus, the testimony of Tom Goggans should not be considered at all. But, taking it for what it says it still demonstrates conclusively that, consistent with the written contract, the purchasers were not relying on any representations. Further the representations, assuming any were made, were not shown to be untrue. For all that the evidence shows, an "odd looking stake" might be anywhere. The plaintiffs received the same amount of property they bargained for. They simply made their own mistake in its exact location and located some of their improvements in the wrong place.

Thus, even under the law cited by the majority opinion to reverse the trial court, the foregoing fact situation demonstrates the majority is in error and the trial court should be upheld.